Mr. James Dawntay Ellis
BD-5448 1-D-17
San Quentin, CA 94974
<u>In Pro se</u>

<u>DEATH PENALTY CASE</u>



THE UNITED STATES FEDERAL DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JAMES DAWNTAY ELLIS,

    Appellant/Petitioner,

v.

THE STATE OF CALIFORNIA,

    Respondents.

Case No. EDCV20-43-FMO

Superior Ct. Case No.

PETITION FOR A WRIT OF HABEAS
CORPUS UNDER <u>TITLE 18 U.S.C. § 3231
(b)(i)(ii)</u> AND <u>TITLE 28 U.S.C. §
2264 (A)(1)</u>. "THERE IS NO EFFECTIVE
STATE COURT PROCESS TO PROTECT THE
RIGHTS OF THIS
APPLICANT/PETITIONER.



**DEATH PENALTY**

    Petitioner is a <u>CONDEMNED PRISONER</u> currently being held in San Quentin State

Prison without any appellate rights, privileges, immunities, or appellate remedies

<u>GUARANTEED BY THE UNITED STATES CONSTITUTION</u> and the People of the Electorate of

California.

    Petitioner was convicted of First Degree Murder with Special Circumstances and

sentenced on 6/6/2017. <u>See Attached</u> Minute Order. <u>Exhibit (1)</u>. San Bernandino County.

    The trial court judge, Eric M. Nakata, attempted to appoint counsel for

appellate review, See page 10323 of Minute Order. However, shortly thereafter the

court was contacted by The San Francisco Public Defenders Office, Attorney, Mary McComb, and The Habeas Corpus Resource Center, Attorney/Director, Michael Hersek, both of whom instructed the court that his appointments would have to be coordinated through their offices, rather than the newly enacted provisions of Proposition 66, which transferred jurisdiction of Habeas Corpus, "and all related matters," to the Superior courts.

More than two years after the People of California voted to "Revamp" the entire capital appellate process in California, none of the provisions enacted by the electorate have been implemented by state officials.

This petition is necessary because it is the only means available to Petitioner to challenge the wrongful conviction and illegal detention imposed by the State of California. All other appellate remedies approved by the voters of California in Proposition 66 have been rendered null and void by the state officials continuing use of the California Supreme Court's Policies Arising from Judgements of Death," which were effectively superseded by Proposition 66.

Under the now defunct policies condemned prisoners were denied counsel for habeas corpus/collateral attack, funding, and investigation and presentation of their federal constitutional claims. Proposition 66 restored these rights. However, state officials have not and may not ever implement the provisions of 66, given they cannot recruit enough qualified attorneys for condemned prisoners. This inability to provide legal counsel violates the <u>Due Process Clause of the United States Constitution.</u>

Ergo, Petitioner has a right to the restored legal rights of Proposition 66, however, Petitioner is being denied those rights by state officials who continued to use policies. Thus, there is <u>NO EFFECTIVE APPELLATE PROCESS TO PROTECT THE RIGHTS OF APPLICANT/PETITIONER.</u>

I declare under penalty of perjury that the foregoing facts and information

ii.

provided within this petition for a Writ of Habeas Corpus are true and correct to the best of my knowledge.

Dated:___/___ 2020.

                                        _____
                                        JAMES DAWNTAY ELLIS,
                                        In Pro se

TABLE OF CASES

People v. Barton, 21 Cal. 3d 513, 518.

People v. Gonzales, 51 Cal. 3d 1260

People v. Hawthorne, 4 Cal. 4th 43, 63 (1992).

Briggs v. Brown , Case No. S238309 August 24, 2017.

People v. Flood, 18 Cal. 4th 470 (1998) 76 CR 180.

People v. Venenzuela, 175 Cal. 3d 381, 390 (1985). 222 CR 405.

In Re: Barnett, 31 Cal. 4th 466 (2003)

In Re: Bower, 38 Cal. 3d 865, 873 (1985)

In Re: Clark, 5 Cal. 4th 750

In Re: Spears, 157 3d 1203, 1210. 204 CR 333

Burlington Northern & Santa Fe Ry. Co. v. Public Utilities Commission
(2003) 112 Cal. App. 881.

Professional Engineers in California Government v.  Kemton
(2007) 40 Cal. 4th 1016, 1038


United States Constitutional Provisions:

FIFTH AMEND.

SIXTH AMEND.

EIGHTH AMEND.

FOURTEENTH AMEND.

FIFTEENTH AMEND.

Proposition 62

Proposition 66.

Proposition 8.

United States Const. Art. 1 Sec. 9 Cl. 2

Harris v. Nelson, 394 U.S. 286

Draper v. Wasington, 372 U.S. 487, 496

Enstminger v. Iowa, 386 U.S. 748 (1967)

Ford v. Waingwright, 477 U.S. 399, 411 (1986)

Massachussets v. Board Retirement, v. Virgina, 427 U.S. 307, 312 (1976)

San Antonio School District, v. Rodriquez, 411 U.S. 1, 16 (1973)

United States v. Avendano-Camacho, 786 F. 2d. 1392, 1394 (9th Cir. (1986)

e.g. Simmons, 390 U.S. 377

Stickland v. Wasington, 466 U.S. 668 (1984).

Rules of Court

Prop. 66 Sec. (g) Local Rules # 4.562

Criminal Law Procedure & Practice § 44:29.


Title 18 U.S.C. § 3231 (B)(i)(ii).

Title 28 U.S.C. § 2264 (A) (1)

Cali Constitution.

Cal. Const. Art. 1 Sec. 11

California Government Code § 62882.


Additional Sources of Facts & Information.

Review of Death Penalty Judgements by California Supreme Court: A Tale of Two Courts, By Prof. Gerald Uelman.

Death & Harmlessness: Application of the Harmless Error Rule by the Bird and Lucus Courts in Death Penalty Cases. A Comparison & Critique. By Prof. Kessler.

Executing the Will of the People."

A Roadmap to Mend or End the California's Legislatures Multi-Billion Dollar Death Penalty Debacle.

Remedies For California Death Penalty Deadlock. By Justice Arthur L. Alarcon & Prof. Paula Mitchell.

Death Penalty Appeals and Habeas Corpus Proceedings: The California Experience. By Prof. Gerald Uelman.

California Commission on the Fair Administration of Justice. Declaration of Michael Millman, director of Habeas Corpus Resource Center. Also:

A Broken System: Error Rates in Capital Cases.

Judges & The Politics of Death. By Bright & Keenan. Also:

Deciding Between The Bill of Rights and the Next Election in Capital Cases:

(1)

QUESTION PRESENTED

IS THERE AN EFFECTIVE CAPITAL APPELLATE PROCESS
AVAILABLE TO PROTECT THE RIGHTS OF PETITIONER?

- IF NOT -

IS PETITIONER ENTITLED TO SEEK FEDERAL REVIEW OF
HIS STATE COURT JUDGEMENT AND SENTENCE?

(2)

QUESTION PRESENTED

THE CALIFORNIA ELECTORATE PASSED PROPOSITION 66
TO RESTORE COLLATERAL ATTACK/HABEAS CORPUS
TO THE CAPITAL APPELLATE PROCESS

- IF -

CALIFORNIA STATE OFFICIALS HAVE FAILED
TO IMPLEMENT THE RESTORATIVE MEASURES
DOES THIS FAILURE SERVE A LEGITIMATE GOVERNMENT
INTERESTS

- IF NOT -

IS PETITIONER ENTITLED TO FEDERAL RELIEF OF HIS
STATE COURT JUDGEMENT AND SENTENCE?

.

JURISDICTIONAL STATEMENT:

The State of California has no jurisdiction over the civil procedure governing capital appeals on habeas corpus, collateral attack.

On June 6, 1989 the California Supreme Court unilaterally promulgated "Policies Regarding Cases Arising from Judgements of Death." Those policies, and the revisions that the court made to them over the past three and a half decades eliminated the writ of Habeas Corpus/Collateral Attack from the capital appellate process. It was replaced by "Executive Clemency/Habeas Corpus."

The California Supreme Court took specific actions to virtually place the Great Writ outside the reach of condemned prisoners. First, counsel is appointed for direct appeal and the court adjudicates the appeal and declares a "Final Judgement." The delays in the availability and appointment of counsel for "Executive Clemency/Habeas Corpus" is 17 to 25 years. Once this attorney is appointed they are instructed that they are NOT to use public funds for an attack on the judgement. Instead, they are told to focus on obtaining a modification of the death sentence. Evidence of the loss of this appellate tool can be found in the numbers. During the 36 years that policies have been practiced, only one Habeas Corpus/Collateral Attack petition has been granted. After medical records disputing the prosecutions cause of death and **special circumstance allegation were discovered.** The case of Vincente Benevides took twenty-five years to resolve. 1,000 capital cases have been adjudicated, and only one reversed. Clearly the writ of habeas corpus is absent from the appellate process.

The second step in phasing out the Great Writ occurs when direct appeal counsel is instructed to "Make a List of all Potentially Meritorious Habeas Corpus issues." This instruction to direct appeal counsel verges on the edge of deliberate obstruction of counsel's performance. Counsel is told to "Preserve them," not attack

i.

the judgement, or his clients illegal detention.

Counsel is fully aware that executive clemency counsel will not be appointed for twenty years. That his client will suffer decades of unnecessary imprisonment.

Once counsel for executive clemency is appointed they are "LIMITED" in their representation to trial counsel's existing files, appellate briefs, and the list provided by direct appeal counsel. If that list survives. A cursory review of any 50 habeas petitions reveals that if these claims are presented they are without merit, because no funding and/or investigation has been conducted to gather additional post-trial evidence supporting the claims. Thus, counsel at the end of each claim: begs the court to reverse the penalty, not the conviction. And because counsel for direct appeal has already filed a Writ of Certiorari to the United States Supreme Court, the record has been sealed as the official state court record and will NEVER be expanded.

The final phase in the elimination of the Great Writ from the capital appellate process came in two separate cases the court adjudicated.

See In re Reno, 55 Cal. 4th 451.

> "The initial burden of proving beyond a reasonable doubt is on the prosecution, and the panoply of rights accorded an accused person prior to his conviction supports the presumption that he is innocent. Different considerations apply, however, to collateral attack, all presumptions favor truth, accuracy, and fairness of the conviction and sentence. The defendant thus must undertake the burden of overturning them... The State may properly require that a defendant obtain some concrete information ON HIS OWN, before he invokes collateral remedies against a final judgement."

Now See People v. Gonzales, 51 Cal. 3d 1260:

> "If a criminal defendant has un-successfully tested the States evidence at trial and appeal, and wishes to mount a further, collateral attack, all presumptions favor truth, accuracy and fairness of the conviction and sentence... Society's interests in the finality of their criminal proceedings so demands, and due process is not offended."

This presumptive position of the court declares the writ of habeas corpus/collateral attack is unnecessary as a post-trial appellate tool in determining

whether the trial was constitutionally adequate. Without the safeguards provided by habeas corpus, claims like conflicts of interests and innocence are foreclosed forever.

There has been nearly 200 cases where condemned prisoners have made claims that the trial transcript is defective and deficient. Despite this fact, the trial court, and direct appeal counsel, work together to certify the record as complete and accurate.

The California Supreme Court has adjudicated nearly 1,000 capital appeals. They have reversed approximately 8 cases, all for one form of juror misconduct or another. All other claims are summarily dismissed as "Harmless Errors" that did not effect the verdict. These inadequate transcripts do not provide counsel with the information necessary to be effective. The perfunctory pleadings are never given a fair and adequate review. And all direct appeals have had the federal constitutional violations removed, and are being preserved. Truth, accuracy and fairness?

The California Supreme Court had no authority to remove this civil procedure from the capital appellate process. Assuming they had authority to manipulate criminal practices and procedures, to remove this civil procedure whose purpose it is to challenge wrongful convictions and illegal detentions, was never within their authority. The court recognized the civil nature of the writ in Briggs v. Brown, supra.

> At Page 35: "An inmates rights regarding legal representation in a state habeas corpus proceedings are even more limited than on an appeal. Habeas Corpus relief is further removed from the criminal trial than is appellate review. It is not a part of the criminal proceeding itself, and it is a fact considered to be civil in nature..."

> [a] "habeas corpus matter has long been considered a separate matter from the criminal case itself... In re Carpenter, supra, 9 Cal. 4th at page 645 646, which held that the superior court had jurisdiction over a habeas corpus petition challenging the judgement in the underlying criminal case, even though it lacked jurisdiction in the criminal case because it was on appeal."

The court has forfeited any claim they had of jurisdiction over habeas corpus collateral attack, in capital appellate proceedings. The California

Supreme Court is once again using its authority to stripe United States citizens of their Guaranteed Constitutional Rights, liberty, and is now actively pursuing ways to dismantle the effectiveness of the People's Will.

The question now before this court is a simple one. Does the California Supreme Courts interference with the implementation of 66 serve a legitimate government interest? An interest so compelling that United States citizens can be deprived of all constitutional protections in order to achieve the governments goals? Always mindful that capital cases require a heightened level of scrutiny because Petitioner faces the ultimate and irreversible punishment, death.

For decades the federal courts have abdicated their responsibility as guardians of the People's rights against - lawless state actions. Extending a courtesy to a lawless actor who is tearing at the very fabric of democracy, would be an insult to the history and tradition of America.

Congress sought to interpose the federal courts between the state and the People's rights. In their wisdom congress enacted:

> Title 18 U.S.C. § 3231 (b)(i)(ii): "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the death judgement of a state court shall not be granted_UNLESS it appears that: (b)(i) There is an absence of available state corrective process. Or (b)(ii) Circumstances exist that render such process ineffective to protect the rights of the appellant."

To express the intentions of this statute, congress also enacted additional safeguards:

> Title 28 U.S.C. § 2264 (A)(1):
>
> "(A) Whenever a prisoners under a capital sentence files a petition for habeas corpus relief to which this chapter applies, the district court shall only consider a claim or claims that have been raised and decided on the merits in state court, UNLESS the failure to raise the claim properly is (1) The result of state action in violation of the Constitution, or laws of the United States."

iv.

The elimination of the institution of the Great Writ verges on Communism. This writ has a rich and traditional flavor that provides a means for Americans to secure the rights and privileges they are entitled to by birth, and citizenship. This specific writ is so vital to the rights of free men and women that it is enshrined in the constitution.

U.S. Const. Art. I Sec. 9 Cl. 2.
"The privilege of the Writ of Habeas Corpus SHALL NOT BE SUSPENDED unless when in cases of rebellion, or invasion the public safety may require it."

Cal. Const. Art. I Sec. 11
"Habeas Corpus MAY NOT BE SUSPENDED unless required by public safety in cases of rebellion or invasion."

U.S. Const. Amend. XIV.
"No State shall make or enforce any law which shall abridge the privileges or immunities of Citizens of the United States; nor shall any state deprive any person of Life, Liberty, or Property without Due Process of law, nor deny to any person within its jurisdiction the Equal Protection of the Law."

All other prisoners can avail themselves of this Great Writ to secure the rights the U.S. Const. affords them. . Only the condemned prisoners of California have been singled out for this un-equal treatment. To require Petitioner to obtain some concrete information in order to invoke a right that is inalienable, is an unreasonable application of law. Petitioner is poor, and imprisoned in one of the most secure prisons in the State of California, he cannot be expected to conduct an investigation and provide the court with additional information, when the court will not appoint counsel, and provide funding. Petitioner notes that the court did not cite any authority or precedent for placing such a requirement on the availability of the Writ. And the statement that Due Process is not offended is nonsensical. The entire constitution of the United States of America is offended.

If this court considers the United States Constitution important to the continuation of our democracy, then accept jurisdiction.

v.

Petitioner asserts that exhaustion is made impossible by virtue of the fact that there is no writ of habeas corpus to challenge the State Capital Appellate Process. <u>The California Supreme Court rejects all pro se pleadings.</u>

There is no doubt that the California capital appellate process is "dysfunctional." However, there is nothing dysfunctional with the United States Constitution and the statutes that flow from it. The California Supreme Court unilaterally decided to make their own law. In doing so they violated the <u>Fifth, Sixth, Eighth, Fourteenth,</u> and <u>Fifteenth</u> Amendments of the United States Constitution. The result is nearly 1,000 poor men and women of color warehoused in maximum security prisons under constant threat of execution. Irregardless of whether they are innocent. Held indefinitely for decades without legal recourse from their wrongful judgements and illegal detention.

The Founding Fathers and Congress anticipated this day. This is why they installed the United States District Courts as Guardians of the People's rights against arbitrary, capricious, and lawless state actions.

For the past 36 years the California Supreme Court has been permitted to "experiment with the lives of condemned prisoners unfortunate enough to be convicted of capital murder. Whether guilty or not condemned prisoners have suffered decades of imprisonment without appellate remedies. The unilateral decisions and the unconstitutional capital appellate process that flowed from it, was eliminated by virtue of the California voters passage of Proposition 66. That is the law now. The provisions that restored collateral attack and innocence claims, expedited the process, appointed qualified counsel, funding for a post-trial investigation, gave hope to hundreds, has not been realized. Policies are dead and Proposition 66 is, too. There are <u>NO LAWS AVAILABLE TO PROTECT THE RIGHTS OF APPELLANT.</u>

Finally, the federal courts have been reluctant to "interfere with on-going" criminal state proceedings. However, this is <u>NOT an on-going criminal state proceedings.</u>

The State of California has removed the Great Writ from the capital appellate process, and replaced it with habeas corpus/executive clemency. This fact will be further supported by arguments made within this petition. Suffice it to say here, habeas corpus is a <u>CIVIL MATTER,</u> and as such is <u>NOT</u> a part of the "on-going criminal proceedings." Further, the civil nature of the Writ has been virtually placed out of reach of Petitioner and those similarly situated by an "unreasonable requirement," enumerated by the California Supreme Court.

<u>In Re Reno,</u> 55 Cal. 4th 471, the court stated: "The State may properly require that the defendant provide the court with some concrete information <u>"ON HIS OWN,"</u> before he invokes collateral proceedings against a final judgement." This requirement essentially cuts off Petitioner's access to this civil procedure.

The current process being employed will appoint counsel for direct appeal ONLY ten years from now. Counsel for executive clemency/habeas corpus will not be appointed for twenty to twenty-five years from now. And unless Petitioner, who is indigent and locked up within a maximum security prison can somehow conduct an investigation to provide the court with some concrete information (which is not defined within Reno), then the Great Writ of habeas corpus challenging the judgement and illegal detention is effectively eliminatd. The California Supreme Court will not appoint counsel. (The jurisdiction for appointment of habeas corpus counsel is now in the superior court) but is being blocked by the Habeas Corpus Resource Center, under the direct supervision of the California Supreme Court. No funding for collateral attack of the judgement will happen in Petitioner's case as long as the California Supreme Court continues to impede the provisions of Proposition 66.

The state cannot claim that this court has interfered or interrupted its on-going criminal proceedings, when there are no proceedings. And this court should not be concerned with interfering when jurisdiction is mandated by the state's failure to provide habeas corpus/collateral attack to Petitioner in the first place.

viii.

<u>INTRODUCTION</u>

On June 6, 1989 the "Lucus Court" promulgated "<u>Policies Regarding Cases Arising</u> <u>from Judgements of Death.</u>" The capital appellate process created by the court was done unilaterally. The judicial Council did not participate. The Legislature did not participate. The Voters did not participate. These policies were not consistent with Statutes, Rules of Court, or the State Constitution. In fact, they eliminated essential guaranteed constitutional rights of every United States citizen. To insure that these new policies would not be challenged the court seized control of all aspects of the process. Appointment of counsel. The order of pleadings, record corrections, direct appeal, executive clemency/habeas corpus, and Cert. petitions, then eliminated collateral attack/habeas corpus entirely. Prohibited pro se pleadings of any kind from condemned prisoners. And required all attorneys seeking appointment to capital cases to agree to the policies and their limitations.

The stage was set, and as a long term consequence of these unauthorized policies, attorneys are prohibited from challenging any deficiencies in the trial court record. They must augment, settle, or stipulate to the record allowing the trial court to certify a record that in many cases is inadequate, incomplete, and inaccurate. 100% of all automatic appeals are affirmed on these defective records. Leading to the largest death row population in the nation. Two judgements have been reversed in 36 years. And 5% of penalty trials are reversed routinely.

The claims that counsel is permitted to file with the court are perfunctory. And counsel is prohibited from raising any factual challenges to the judgement. Such as the lack of an arrest warrant, search warrant, affidavits and/or declarations supporting police actions. And because direct appeal counsel is required to remove all "potentially meritorious habeas corpus issues," from the record and "Preserve them"

i.

until a later date, when habeas counsel is appointed, ("if warranted") none of these claims are presented in the direct appeal and are therefore subject to a <u>Dixon default.</u> Any claims not presented in the direct appeal cannot be raised for the first time in a federal writ of habeas corpus.

The average lapse in time from the resolution of the direct appeal until the appointment of "executive clemency/habeas counsel is now 17.3 years. Some condemned prisoners have been waiting for more than 20 years. And when counsel is appointed, he or she is faced with twenty year old issues, no funding, and limited to only those issues that affected the sentence, not the judgement.

Two years ago the People of this State went into the voting booths and passed <u>Proposition 66.</u> Their intent was clear, revamp the capital appellate process. Expedite capital appeals. Restore collateral challenge/habeas corpus. Appoint habeas counsel immediately after sentencing from the trial court. Grant funding, and conduct investigations by qualified counsel. Provide a mechanism for those who are innocent. Prohibiting superior court judges from dismissing any petition that makes a prima facie case for innocence. Transfer condemned prisoners to other prisons where they would be required to work and pay restitution to their victims. And removed the cumbersome <u>Administrative Procedures Act,</u> that had blocked executions for so long. The voters were clear. Their objectives were clear.

Despite challenges to the initiative, the California Supreme Court found it constitutionally sound and approved the implementation of the new capital appellate process on August 24, 2017.

However, immediately following the court's approval of the initiative, the court and the Judicial Council began taking steps to undermine and defeat the Will of the Voters. Two years after the voters passed Proposition 66 the only provisions that have

occurred is  the dissolution of the Board of Directors at the Habeas Corpus Resource Center, and the elimination of the Administrative Procedures Act.

Despite the California Legislature having fully funded the trial courts for the implementation of 66, not a single appointment of habeas counsel has been made. No local pools of qualified attorneys are being assembled in any county. Not a single collateral attack petition has been filed. Not a single innocence claim has been filed. And all new incoming attorneys who meet the qualification standards are being steered into the ranks of the Habeas Corpus Resource Center, where they are being appointed to those condemned prisoners who have been waiting the longest for representation. No condemned prisoners have been transferred from San Quentin to other facilities. And the only cases being sent to the superior courts for adjudication are those that have been fully briefed under the court's previous policies. They challenge only the sentence, have not been funded, investigated, and require no additional appointments, funding, investigation, and will be resolved in the same manner as those previously adjudicated by the California Supreme Court. This is not what the ' Voters envisioned.

This begs the question, why has the California Supreme Court decided to once again usurp the Will of the People, in order to maintain a crippled and dysfunctional capital appellate process that has failed so miserably? The answer is a complicated one...

At the heart of their interference with 66 is the restoration of collateral attack/habeas corpus. And the mandate that no superior court judge can dismiss a petition that makes a prima facie case for innocence. For the past 36 years 800 plus condemned prisoners have been denied collateral attack. And no innocence claims can be supported without post-trial funding and a full and complete investigation. It is not

difficult to imagine that ten to fifteen percent of California's condemned prisoners are innocent. That is approximately 140 individuals.

Each and every condemned prisoner is entitled to file a collateral attack whether it includes an innocent claim or not. Qualified, conflict free, independent counsel, well funded investigations would expose the fact that hundreds of men and women have been warehoused for decades without any legal redress, despite their innocence.

Now imagine a qualified attorney who is made aware of the list of potentially meritorious habeas issues that have grown stale. And rather than attempt to revive these claims, he or she chooses to use collateral attack to attack the prejudice inherent within the policies. These types of challenges could and most likely would result in the reversal of hundreds of capital judgements.

Petitioner asserts that is exactly what the voters demanded when they drafted Proposition 66 and voted to pass it.

The California Supreme Court now has complete control over the operations and funding of the Habeas Corpus Resource Center. The Chief Justice of the Supreme Court sits on the Judicial Council. Superior courts and the Courts of Appeal are powerless to do anything but what the State's high court dictates.

The voters were assured through the initiative process that their votes would correct the fundamental defects that had costs tax payers 4.5 billion dollars, resulting in thirteen executions. Condemned prisoners were hopeful that the restoration of independent counsel, funding, and an investigation would allow for the legitimate challenge to their wrongfully obtained judgements and illegal detention. We were both wrong.

Petitioner will demonstrate the inherent deprivations within policies, explore the correct implementation of Proposition 66. And illustrate how the California

To further demonstrate the conflicts within the provisions of Proposition 66 and the will of the voters, Petitioner points to the following language with the proposition.

Section 13, Sec. 68660.5: (d) "To recommend attorneys to the Supreme Court for inclusion in a roster of attorneys qualified as counsel in habeas corpus proceedings in capital cases, provided that the final determination of whether to include an attorney in the roster shall be made by the Supreme Court and NOT delegated to the Center."

Also see: (f) "To employ investigators and experts as staff to provide services to appointed counsel upon request of counsel, provided that when the provision of those services is to private counsel those services shall be pursuant to contract between appointed counsel and the Center."

See (n) "To develop a brief bank of pleadings and related materials on significant, recurring issues that arise in habeas corpus proceedings in capital cases and to make those briefs available to appointed counsel."

Now See (1) "The center shall report annually to the People, the legislature, the Governor, and the Supreme Court on the status of the appointment of counsel for indigent persons in habeas corpus capital cases, and on the operations of the center."

This is precisely the same contract the "Center" maintains for the policies. The California Supreme Court makes the final determination, after the attorneys sign a contract with the HCRC, agreeing to policies. And all pleadings are the product of a bank of perfunctory pleadings maintained by the center. The experts and investigators are all staff members of the HCRC, and are LIMITED in their scope of investigations and expert analysis to only executive clemency.

These provisions demonstrate that the California Supreme Court has not

v.

relinquished control and/or jurisdiction over the capital appellate process where habeas corpus is concerned.

The appointment of qualified counsel is undermined by the contract the attorneys must sign with HCRC. And if a qualified attorney refuses to accept the terms of the contract then the California Supreme Court will not add that attorney to the roster for appointments. Nothing has changed.

The voters passed a provision which removed the California Supreme Courts jurisdiction over habeas corpus proceedings. Period. The California Supreme Court should not play any role in the appointment of counsel. The California Supreme Court should not be in control of HCRC, and the California Supreme Court should not have the final say in who gets included in the appointments and who doesn't. Habeas corpus, "and all related matters," are now the exclusive purview of the Superior Courts. The voters did this for a specific reason. Because the California Supreme Court, without authorization and or participation of the California Legislature, removed collateral attack habeas corpus from the capital appellate process. The voters understood that in order to restore this legal right, it would be necessary to exclude the California Supreme Court from the process of appointments, funding, and investigations, and in-coming new attorneys would necessarily be free and independent to initiate habeas corpus proceedings without interference from the California Supreme Court. This has not happened, and will not happen, until and unless the People and/or this court intervenes to enforce the Will of the people who voted for these reforms.

The problem is not so much the court's control; over the HCRC, the problem arise from the fact that the state's high court refuses to turn over jurisdiction to an inferior court. However, the voters passed it, and the court approved it.

<u>LEGAL ARGUMENTS:</u>

To fully appreciate the deprivations caused by the Policies, it is necessary to examine them at each phase of the capital appellate process.

Only one attorney is appointed for four specific tasks. 1. Prepare a record for appellate review. 2. File the Automatic Opening Brief. 3. Oral Arguments and once the judgement has become final, as they do in 100% of all capital appeals, counsel is required to file a writ of Certiorari to the United States Supreme Court. The average time it takes to complete this process is now 34 years.

The first, and perhaps the most damaging aspect of the process is records correction. Counsel is instructed to read the trial court record, identify specific claims authorized by the court, and while correcting typographical errors, remove all "Potentially Meritorious Habeas Corpus issues, and <u>"PRESERVE THEM,"</u> for "Executive Clemency/Habeas Corpus counsel. Who will be appointed at a later date, <u>("If Warranted.")</u> The average delay in the appointment of habeas counsel is now 18.9 years. And because counsel for direct appeal will not include these federal constitutional violations in the direct appeal, they are subject to the <u>Dixon Rule.</u> That any claim not presented in the direct appeal cannot be presented to a federal court for the first time.

During the actual court appearances counsel is required to submit motions augmenting, settling, and stipulating to the deficiencies in the record. Missing documents, such as search warrants, arrest warrants, affidavits and declarations are supplemented into the record post-trial. Large volumes of trial transcripts missing. Side bars, in chamber conferences and juror questionaires are often destroyed and/or missing. Despite the incomplete and inaccurate trial court record, the trial judge always certifies the record, once for completeness and once for accuracy.

Both the California Supreme Court and the United States Supreme Court have long recognized that under the Due Process Clause of the Fourteenth Amendment, the State has a duty to provide every appellant an adequate, complete and effective appellate review of his or her conviction. Entsminger v. Iowa, 386 U.S. 748 (1967) Draper v. Washington, 372 U.S. 487, 496. And People v. Barton, 21 Cal. 3d 513, 518. "A complete and adequate appeal constitutionally requires a competent attorney acting as an advocate for the appellant and an appellate record that will permit a meaningful, effective presentation of the indigent's claims."

The California Supreme Court has likewise reaffirmed, in capital context, "the critical role of a proper and complete record in facilitating meaningful appellate review." See People v. Hawthorne, 4 Cal. 4th 43, 63. (1992). A cursory review of the motions filed by appellate counsels will reveal that the trial court record in capital cases is always defective and inadequate for any meaningful appellate review. The condemned prisoner is not permitted to attend these hearings, and in many cases does not know they occur. Unlike all other pleadings filed by appointed counsel wherein Petitioner is served, no such courtesy is applied to these particular hearings.

This records correction process can take anywhere from two to eight years to complete. Condemned prisoners are never given record corrections transcripts.

Once the record has been altered sufficiently to permit the affirmance of the judgement, counsel must file the Automatic Opening Brief. Wait for the Respondents Reply Brief, and then file any additional facts and/or information contradicting the Respondents allegations. This process can take anywhere from 6 to 10  years to complete. The courts delay in deciding capital appeals is six years. Oral arguments are held, within 90 days, the judgement is affirmed in 100% of all automatic appeals. By applying the "Harmless Error Analysis, the court fails to correct instances of fraud, perjury, false evidence, Brady Violations, and numerous abuses of judicial discretion.

2.

Once the judgement becomes final, the court appoints Exec. Clemency counsel. The average delay in the appointment of habeas counsel is 23 years. There are 350 condemned prisoners who are awaiting habeas counsel. Some have waited as much as twenty-five years. <u>Counsels responsibilities are limited to challenging the sentence,</u> and collateral attack of the judgement is prohibited. <u>See Policies: 1-1.</u>

> <u>Page 3. "Timeliness Standards:</u> "If separate "post-conviction habeas corpus/executive clemency counsel (hereafter, Habeas Corpus Counsel") is appointed, counsel shall delivery to nabeas corpus counsel copies of the list of potentially meritorious habeas corpus issues..."

<u>The Policies continue...</u> <u>at 1-1.</u>

> "The duty to investigate is <u>LIMITED</u> to investigating potentially meritorious grounds for relief that come to counsel's attention in the course of reviewing appellate <u>counsel's notes</u> prepared by appellate counsel, the <u>appellate record</u>, <u>trial counsels existing files</u>, and the <u>appellate briefs...</u> The duty to investigate does not impose on counsel an obligation to conduct, <u>nor does it authorize</u> the expenditure of public funds for, an unfocused investigation having as its object <u>uncovering all factual bases for a collateral attack on the judgement."</u>

Direct appeal counsel has fabricated a trial court record free of United States Constitutional violations. Delivers those stale claims to executive clemency counsel 24 years later, and habeas counsel is instructed not to use public funds to investigate those claims. By virtue of the order of pleadings, the Policies literally eliminate collateral attack from the capital appellate process. Further evidence of this fact can be found in two of the States High Court's decisions. <u>See In Re: Reno;</u> 55 Cal. 4th 451.

> "The initial burden of proving beyond a reasonable doubt is on the prosecution, and the panoply of rights accorded an accused person prior to his conviction supports the presumption that he is innocent. Different considerations apply, however, to collateral review of a <u>final judgement.</u> For purposes of collateral attack, all presumptions favor truth, accuracy, and fairness or the conviction and sentence. the defendant thus must undertake the burden of overturning them... The state may properly require that a defendant obtain some concrete information <u>ON HIS OWN,</u> before he invokes <u>collateral remedies against a final judgement."</u>

Now See People v. Gonzales, 51 Cal. 3d 1260:

> "If a criminal defendant has un-successfully tested the state's evidence
> at trial and appeal, and wishes to mount a further, collateral attack,
> all presumptions favor truth, accuracy and fairness of the conviction
> and sentence... Society's interests in the finality of their criminal
> proceedings so demands, and due process is not offended."

Petitioner vehemently disagrees with the courts presumptions. First, judges and

prosecutors who participate in capital trials understand that their misconduct and

abuses of judicial discretion can be erased from the record prior to its certification.

Additionally, claims such as Ineffective Assistance of trial Counsel cannot be asserted

and supported without a post-trial investigation into what counsel may have missed.

Issues like innocence, conflicts of interests, and defense counsels lack of training

and qualifications to represent Petitioner in a capital trial, are all claims that

will never be investigated and/or presented to any court for adjudication. Thus, the

court's presumption that Petitioner has tested the state's evidence at trial is

patently false. And because all of the serious, and potentially critical claims that

could reverse the judgement have been removed from the record prior to its adjudication,

the California Supreme Courts appellate review is nothing more than perfunctory and

predictable. The Court's presumption that its process actually tested the evidence at trial

is ridiculous. If we were gullible enough to assume that the courts rulings are

appropriate, then we must also assume that more than 1,000 capital trials have occurred

and all parties performed their duties with absolute perfection. Ridiculous.

It is the elimination of the Great Writ from the appellate process that has created

the significant backlog. And it is the courts decision to block all condemned pro se

pleadings, that has allowed this unconstitutional appellate process to exist for 36

years. Clearly the California State Attorney General has raised no objection to these

policies because all of his prosecutors enjoy assurances that their judgements will

4.

not be disturbed on appeal. In fact, the attorney general brags of the highest affirmance rate in the entire nation. Of course, they cheat.

The California Supreme Court has created an "Automatic Appeal process that guarantees that the trial court judgement will be affirmed. This is demonstrated by the 100% affirmance rate over a span of three and a half decades. No criminal justice system operates with this efficiency and perfection. The court without any participation of the Judicial Council, legislators, or the voters, perfected this process by provisions over the years. However, when the voters of California went to the polls and voted for Proposition 66, the policies that had been void and invalid all along officially ended. Here is what the court said about the intended purpose of 66.

In Briggs v. Brown, decided August 24, 2017, case No. S238309, on page 28: "CA(1) "The constitutions initiative and referendum provisions should be liberally construed to maintain maximum power in the People... The initiative is the power of the electors to purpose statues and amendments to the constitution and to adopt or reject them. (2) We have declared it our solemn duty to guard the precious initiative power, and to resolve any reasonable doubts in favor of its exercise." Now See page 26.

> "The initiative measure extensively revamps the procedures governing habeas corpus petitions in capital cases. Under current practices (policies) habeas corpus proceedings are initiated in this court, which appoints counsel and provides for their compensation. Under the initiatives measure, however, [a] petition filed in any court other than the court which imposed sentence should promptly be transferred to that court unless good cause is shown for the petition to be heard in another court. A petition filed in or transferred to the court which imposed the sentence shall be assigned to the original trial judge unless that judge is unavailable or there is other good cause to assign the case to a different judge. The superior court is made responsible for appointing counsel to represent indigent prisoners in capital cases."

Now examine what the court said on page 30.

> "It is not solely concerned with the process of reviewing capital judgements. As the findings and declarations prefacing the measure make clear, it was intended as an extensive reform of the entire system of capital punishment to make it more efficient, less expensive, and more responsive to the rights of victims."

There is one other specific comment that the court made in Briggs regarding habeas corpus in capital cases. See page 35.

> "In re Barnett, (2003) 31 Cal. 4th 466, "Considered whether prisoners sentenced to death, and represented by counsel, are entitled to submit pro se claims related to their habeas corpus petitions. We noted that no such right pertains on appeal when the defendant has an attorney, and emphasized that an inmates rights regarding legal representation in a state habeas corpus proceeding are even more limited on an appeal. Habeas corpus relief is, further removed from the criminal trial than is (appellate) review. It is not a part of the criminal proceedings itself, and it is in fact considered to be civil in nature."

Petitioner begs this court to now juxtapose the proceeding comments of the California Supreme Court with those of the United States Supreme Court in Harris v. Nelson, 394 U.S. 286.

> "The writ of habeas corpus is the fundamental instrument for safeguarding individuals freedoms against arbitrary and lawless state actions. Its pre-eminent role is recognized by the admonition in the U.S. Constitution that [the writ of habeas corpus SHALL NOT BE SUSPENDED]. U.S. Const. Art. 1, Sec. 9 Cl. 2. The scope and flexibility of the writ, its capacity to reach all manner of illegal detention - its ability to cut through barriers of form and procedural mazes - has always been emphasized and jealously guarded by courts and law makers. The very nature of the writ demands that it be administered with the initiative and flexibility essential to ensure that miscarriages of justice within its reach are surfaced and corrected."

In Harris, supra, the court made several key comments. The writ is not a vehicle for class action civil law suits. It is the means by which an individual can seek redress for a wrongful conviction and illegal detention. And because it is a civil (and therefore separate) matter, the California Supreme Court had no authority to eliminate its pre-eminent role in the capital appellate process.

However, it is clear why they did. The lengthy and time consuming record

corrections. Filing to the direct appeal, briefing, and the filing of a writ of Certiorari to the United States Supreme Court, are all part of the deliberate erection of barriers of form and procedural mazes, all done to remove the Great writ from the condemned prisoners of California.

The California Supreme Court used the language of Proposition 8., to justify the restrictions placed on the availability of the Great Writ to indigent condemned prisoners. In violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. More on this later...

The courts decision to unilaterally promulgate an entirely new capital appellate process was spurred on by the Victim's Bill of Rights." Quoting from that measure, "Victims of crimes are entitled to the finality of their criminal proceedings. Lengthy appeals and post-trial proceedings only add to the suffering of victims." The California Supreme Court explicitly chose the Great Writ to eliminate from the appellate process. The most efficient and effective safeguard against illegal detention, striped from the vulnerable citizens who have just been dragged through a highly publicized criminal proceeding, convicted and sentenced to die. Striped of the essential appellate tool necessary to challenge that judgement. There is no legitimate government interest that is served by such a complete and repulsive deprivation of such an important and critical element of American jurisprudence.

The court cannot justify its actions in an attempt to end the prolonged suffering of crime victims. When the Great Writ was available to condemned prisoner prior to June 6, 1989, 92.8% of all capital cases reviewed were reversed for egregious constitutional violations that occurred at trial. After the elimination of the Great Writ, the reversal rate is zero. The egregious constitutional violations are now simply swept under the rug, and those who have been wrongfully convicted are warehoused indefinitely without adequate and meaningful appellate remedy.

7.

The survivors of murder victims suffer decade after decade, expecting retribution and closure and never actually getting it. How many men on death row would be freed because they are actually innocent? Equally important, how many murderers continue to roam their communities because the wrong person is being warehoused without appellate remedy?

Experience has taught us that good prosecutors can inflame the passions of jurors. Judges can be privately or professionally motivated to support the prosecution. Defense lawyers can feel hopeless against the states well funded apparatus. Without the post-trial writ of habeas corpus, the California Supreme Courts claim that Petitioner has tested states case on appeal is hollow. A cursory review of the perfunctory issues that the court repeatedly adjudicates reveals a pattern of practice which is nothing resembling a search for the truth or accuracy, and their decisions certainly do not reflect fairness for poor minorities who are the majority.

Since the Great Writ was established in May of 1679, has it been trampled upon like this. To be clear, the California Supreme Court had no legal or moral authority to place restrictions on the availability of the writ of habeas corpus/collateral challenge.

California Death Row Prisoners were targeted for this deprivation. This violates the Equal Protection Clause of the United States Constitution.

The California Judicial Council, Rules of Court, require defendants to file habeas corpus in a "Non-capital case within one year of the issuance of the courts remittitur on direct appeal. In re Bower, 38 Cal. 3d 865, 873 (1985). However, the California Supreme Courts policies give capital defendants one-hundred and eighty-days from submission of their Reply Brief on direct appeal. Or thirty-six months from counsel's appointment.

8.

Thus, non-capital defendants/appellants have significantly more time to investigate and file their habeas corpus petitions after their direct appeal. However, because condemned prisoners are deprived of counsel, funding, investigation, and collateral attack of the judgement, policies are suited to the six months deprivation. However, condemned prisoners, in light of the gravity and finality of their sentence deserve greater, not lesser time to prepare and submit their petitions. See Dorrough, 420 U.S. 539, and Ford v. Wainwright, 477 U.S. 399, 411 (1986) "All proceedings in capital cases must aspire to a heightened standard of reliability." The California Supreme Court's disparate treatment affects a fundamental right, the right to petition for a writ of habeas corpus, and IS NOT narrowly suited to serve a compelling state interest See Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 312 (1976); San Antonio School District v. Rodriquez, 411 U.S. 1, 16 (1973); and United States v. Avendano-Camacho, 786 F. 2d 1392, 1394 (9th Cir. 1986).

The California Supreme Court's policies also violate the Equal Protection Clause of the Fourteenth Amendment because they require disclosure of arguably highly prejudicial information during the pendency of their automatic appeal. The court's policies require Petitioner (through counsel for executive clemency) to file a clemency petition, which includes potentially damaging information about the Petitioner's background and personality. Information that is not contained with the direct appeal. This contemporaneous filing forces defendants to chose between the fairness of the direct appeal, and a plea for leniency. Surrendering one right in order to preserve another is impermissible. See e.g., Simmons, 390 U.S. 377, "We find it intolerable that one constitutional right should have to be surrendered in order to assert another."

The California Supreme Court's policies also discriminate on the basis of

race and economic status. California's death penalty is selected as a punishment for African-American and Hispanic Americans, more often than Anglo-Saxon Americans. The death row population reflects this disparity. 43% Black. 39% Mexicans. 2% others. And 20% Whites. 99% of these condemned prisoners are indigent. Hence, people of color who are poor and cannot afford the luxury of hiring attorneys and investigators to mount a collateral attack, "ON THEIR OWN," are being denied access to post-trial habeas corpus/ collateral attack of their judgements. While those who can afford such legal representation are accorded collateral challenge. Whether the policies were intended to target minorities for harsher treatment and execution. We may never know. Thus, it is not unfair to call it racist. The California Supreme Court's policies are indicative of racism. People of color have turned to the courts seeking protection from private and government abuses of this kind. Petitioner now seeks this courts intervention. Fairness is a prerequisite for justice.

Petitioner will not waste this court's time arguing that the California Supreme Courts policies are invalid. This fact has been well established by way of five university studies of capital punishment in California, and one of the foremost authorities on capital punishment in California, Former Justice, Arthur L. Alarcon, and his colleague, Law Professor, Paula Mitchell, have published three studies of this unconstitutional process. This information is easily accessed by this court.

Two years ago the voters examined their options. Vote for Proposition 62 and abolish capital punishment. Or, vote for Proposition 66 and revamp the appellate process in an effort to make it more efficient, less costly, and more responsive to the needs of victims. Such as the need to be certain of the accused guilt, and sooner rather than decades later.

For the past two years the California Supreme Court has worked tirelessly to

10.

maintain the status quo, preserve their unconstitutional policies, and deprive United States citizens of their Guaranteed Constitutional Rights to challenge their unlawfully obtained convictions and illegal detention.

The California Supreme Court "Policies Regarding Cases Arising from Judgements of Death," are dead. Or, are they?

See the response by Presiding Judge of San Bernardino County Superior Courts. Attached as Exhibit (A). After months of attempting to secure the rights enumerated in Proposition 66, the court acknowledges that the court has not adopted local rules for the appointment of habeas corpus counsel. The San Bernardino Public Defender's office does not have qualified attorneys to represent Petitioner in a capital habeas corpus proceeding. The current website used to recruit new counsel for appointment per 66, states: "There are currently no counsel designated qualified by appellate district regional committees." The court sent out recruitment flyers to all attorneys on its panel for LWOP, and capital cases, as well as contractors organizing its conflict panel, and 27 other organizations. This superior court has yet to have any counsel agree to accept an appointment in a capital habeas corpus proceeding." "Additionally, this court is required whenever possible, to appoint counsel first for those persons subject to the oldest judgements of death." The court then states that the issue of conflict is not yet ripe for review.

Petitioner strenuously disagrees with this assessment of the conflict and its affect on Petitioner's ability to challenge his wrongfully obtained judgement and illegal detention. Petitioner has spent several years in custody awaiting trial. And has been illegally detained for the past two years without counsel, and without effective remedy to challenge the wrongfully obtained judgement. According to the presiding judge, any counsel appointed will be many years from now and will be

11.

appointed through the Habeas Corpus Resource Center, who are funded by the California Supreme Court, who is also responsible for selecting the Director. All attorneys funneled through the Habeas Corpus Resource Center are paid by the California Supreme Court and are contractually obligated to adhere to Policies. See Page 27 of policies:

> "Section V. A" "Non performance of counsel. In the rare circumstance in which appointed counsel ceases work on a case and refuses to complete the work with reasonable diligence, the court has had, and will continue to exercise as appropriate, the following non-exclusive options: The court may enforce its legal rights; the court may refer the matter to the state bar, and finally, the court may institute contempt proceedings to enforce its orders."

Petitioner asserts that the elapsed time between the appointment of habeas corpus counsel, 10 to 20 years from now will allow the California Supreme Court to appoint counsel for direct appeal. Once that process is initiated any hopes of collateral attack will be eliminated by virtue of the policies, and the court's declaration that the judgement derived in the trial court is final. This is not the intended purpose of the California Voters.

In Briggs, supra, at page 37, The court states: "Under section 1509 (a) Review of habeas corpus rulings is now available to Petitioner on appeal." Is it really? The court continues...

> "Absent some unusual circumstance of some critical evidence that is truly newly discovered, under our law, or a change in the law, such successive petitions rarely raise an issue even remotely plausible, let alone state a prima facie case for actual relief. In the 18 years since In re:Clark, 5 Cal. 4th 750, experience has taught that in capital cases, Petitioners frequently file second, third, and even forth petitions raising nothing but procedurally barred claims.

The reason defendants file second, third, and even forth petitions in the California Supreme Court is because there is no procedure for post-trial habeas corpus collateral attack. These cases therefore must return from federal courts under the presumption that the state court will exhaust any unanswered questions before the federal courts will entertain the claims.

And these claims are procedurally barred because of the policies. See policies at:

>    1.1-2. "A petition filed more than 180 days after the final due date for
>    the filing of appellant's reply brief on direct appeal, or more than 36
>    months after appointment of habeas corpus counsel, whichever is later, may
>    establish absence of substantial delay if it alleges with specificity facts
>    showing the petition was filed within a reasonable time after Petitioner or
>    counsel (a) knew, or should have known, of facts supporting a claim and (b)
>    became aware, or should have become aware, of the legal basis for the
>    claim."

Counsel and Petitioner became aware of these claims twenty years ago. Petitioner at trial, and direct appeal counsel removed these claims from the direct appeal to "preserve them" until habeas corpus counsel would be appointed. Thus, these claims should have, and would have been presented for adjudication but for the court's policies. The court uses their policies to default un-exhausted claims.

If this court refuses to intervene to enforce the Voters Will as enumerated in Proposition 66, Petitioner has no effective means by which to challenge the federal constitutional violations that significantly contributed to the wrongful judgement.

The controlling principles of Policies died on the effective date of Proposition 66. It is Petitioner's contention that all those defendants convicted after the effective date of 66, are entitled to the newly revamped capital appellate process and procedures promised by the electorate.

Petitioner is entitled to conflict free counsel appointed by the trial court, with no obligations and commitments to the Habeas Corpus Resource Center. Even since its inception in 1994, the Habeas Center has been funded and therefore under the direct control of the California Supreme Court. This conflict entitles Petitioner to a attorney selected by the local committee under Rules of Court Rule (g) 4.562 adopted effective April 25, 2019. Only such counsel would be willing and un-restricted to challenge the inherent prejudice created by policies. The two year delay in the post-trial investigation has already resulted in substantial prejudice.

13.

Now See Criminal Law Procedures & Practice: § 44.29:

> "Appellate counsel has the fundamental duty to raise every claim that has
> any likelihood of success, (Either in the court of appeals or a higher
> court), and that would benefit the client if successful. The courts have
> engaged in a prolonged, talmudic effort to define the precise limits of
> this duty as a matter of the defendants constitutional rights. See In re:
> Spears, (1984) 157 CA 3d 1203, 1210, 204 CR 333, Defendant has a
> constitutional right to have appellate counsel raise all crucial assignment
> of error which might arguably result in a reversal, as long as counsel
> believes the issue to be meritorious). People v. Venenzuela, (1985) 175 CA
> 3d 381, 390. 222 CR 405, disapproved on other grounds in People v. Flood,
> (1998) 18 Cal. 4th 470. 76 CR 2d. 180. (Appellate counsel's duty include
> raising all meritorious issues that are nonetheless arguable. Regardless of
> how the constitutional minimum is defined. The diligent appellate
> practitioner will not let the client loose any opportunity to obtain a
> reversal or a favorable modification of the judgement."

Let me be clear, once direct appeal counsel is appointed, he or she will remove

all "Potentially Meritorious Habeas Corpus issues, (Federal Constitutional

Violations) and is required to "PRESERVE THEM" until "Executive Clemency/Habeas

Corpus counsel is appointed some twenty years later. Direct appeal counsel is fully

aware that these meritorious issues could result in a reversal of the conviction and

release from illegal detention for their client. Instead of acting on Petitioner's

behalf, counsel awaits the "Final Judgement," from the California Supreme Court, and

then are instructed to file a Writ of Certoirari to the United States Supreme Court.

This writ contains none of the federal violations, and in 100% of all Cert. petitions

filed, 100% are denied. Creating a record in the state court that will never be

expanded in any other state or federal habeas proceedings. Unless Petitioner can "ON

MY OWN," provide the court with some "CONCRETE EVIDENCE" which requires the court to

consider "INVOKING" Petitioner's right to collateral proceedings. If Petitioner is

unable to provide the court with additional concrete information the federal

violations will simply vanish. This is an unreasonable application of law. Petitioner

is an indigent man of color, who has been wrongfully adjudged and imprisoned in a

maximum security facility where every activity is being monitored by armed guards and surveillance cameras. Petitioner cannot afford a copy of the trial court transcript. The California Appellate Project, (CAP) the custodian of records has been instructed not to provide documents to condemned prisoners. Attorneys not appointed by the California Supreme Court, or the Habeas Corpus Resource Center, along with private investigators, must apply to those agencies for permission to enter this facility to visit Petitioner. Any money that Petitioner might receive to conduct an investigation is subject to 77% deduction for Victims Restitution per court order. Under these limited and restrictive conditions, it is ludicrous to think that Petitioner can conduct an investigation and provide the court with concrete evidence.

Under the voter approved measure, Petitioner is entitled to the appointment of habeas corpus counsel for collateral attack without conflict and/or commitments to the Habeas Corpus Resource Center. Petitioner is entitled to the benefits of the Legislators funding for a complete investigation. That investigation must be expedited now, not 34 years from now after the appeal becomes final and the case moves into federal court, and the claims must be returned to the state court for exhaustion and will be summarily defaulted under the court's policies.

Petitioner contends that qualified attorneys are refusing to participate in the "new" capital appellate process because they understand that their participation means they will become part of the rank and file of the Habeas Corpus Resource Center, and will not be permitted to adequately represent the rights and privileges of their clients. Whatever the reason it is clear that if additional attorneys aren't found to provide counsel for the 350 condemned prisoners currently awaiting appointment of counsel, Petitioner may not receive counsel for a habeas

15.

corpus/collateral attack, _EVER_. Once the judgement becomes final in the California Supreme Court, executive clemency counsel will not even bother to read the trial court record. _See Policies 1-1._

The California Voters passed 66 because they sought to expedite the appellate process through the availability of the Great Writ, and added an additional provision for innocence claims. If attorneys throughout the state are refusing to participate in the process, Proposition 66 becomes nothing more than a disguise for a continuation of invalidated policies.

Despite what the Voter's intended, the California Supreme Court is now sending fully briefed habeas corpus/clemency petitions to the trial court for resolution. This is nothing more than the California Supreme Court dumping their "junk mail" into the Superior Courts inbox. These cases require no appointment of counsel. No funding. No investigations, and do not challenge the constitutionality of the trial court judgement. They simply provide the trial court judge with additional background and social history of Petitioner that it did have at the time of sentencing. Once these cases have been resolved they will be sent to the court of appeals and eventually returned to the California Supreme Court six to ten years later. The California Supreme Court will then summarily deny them as having been twice adjudicated and denied.

Since the passage of 66 not a single condemned prisoner have had counsel appointed by the trial court. Petitioner's superior court judge attempted to appoint counsel and was immediately contacted by the State Public Defenders Office and the Habeas Corpus Resource Center. _See Attached Exhibit_ (B) "Motion to Vacate Order Appointing Counsel on Habeas Corpus from Director, Michael Hersek. Then _See Attached_

<u>Exhibit (A )</u> Proposed Order Vacating Appointment of Counsel on Direct Appeal from Ms. Mary McComb. The court Vacated its previous order.

During the course of the past eighteen months Petitioner has filed numerous pleadings attempting to secure the rights afforded to him by the Electorate. All to no avail.

Just to be perfectly clear, and to disabuse this court of any confusion, Petitioner is <u>NOT</u> challenging the California Supreme Courts Policies. Nor is Petitioner challenging the California Supreme Courts authority to promulgate those policies.

"<u>Policies Regarding Cases Arising from Judgements of Death</u>," became <u>INVALID</u> on the effective date of Proposition 66. See <u>Briggs v. Brown, supra</u>, wherein the court stated:

> At p. 35: "<u>CA(17)</u> For these reasons, <u>section 1509.1 subdivision (a)</u> does not violate the state constitution by granting appellate jurisdiction to the Courts of Appeal in capital habeas corpus proceedings. As petitioner points out, however, it does conflict with <u>section 1506</u>, which requires the People to [***37] appeal directly to this court if they wish to challenge [***486] a grant of relief to a capital habeas corpus petitioner. Proposition 66 does not expressly repeal this provision of <u>section 1506,</u> but an implied repeal is plainly effected. HN16. Although there is a presumption against repeal by implication, [w]hen a later statute enacted by initiative is inconsistent and cannot operate concurrently with an earlier statute enacted by the Legislature, <u>the later statute prevails.</u>" (<u>Burlington Northern & Santa Fe Ry. Co. v. Public Utilities Commission</u> (2003) 112 Cal. App. 881 [5 Cal. Rptr. 3d 503] see <u>Professional Engineers in California Government v. Kempton,</u> (2007) 40 Cal. 4th 1016., 1038 [56 Cal. Rptr. 3d 814, 155 P. 3d 226.].'"

The Guaranteed Constitutional Protections accorded to Petitioner by the California Electorate and approved by the California Supreme Court are sufficient to protect the rights of Petitioner if they were implemented as the electorate expected.

The question before this court is whether the State of California has provided a capital appellate process that is effective at protecting the rights of Petitioner? The simple answer is no. However, to be crystal clear, Petitioner will demonstrate that the State of California has not, and will not implement the provisions of

Proposition 66 which afford Petitioner the rights and privileges Petitioner is entitled to. Thus, the state court process is ineffective to protect the rights of Petitioner.

Proposition 66 provides:

1. Right to the appointment of counsel from the trial court immediately following sentencing.
   (a) No counsel available or being appointed by the trial courts.

2. Right to a fully funded post-trial investigation and presentation of federal constitutional violations that contributed to the judgement.

   (a) No Superior Courts are now permitted to appoint counsel, allocate funding or ancillary funding.

3. Right to Habeas Corpus/Collateral Attack of the judgement.

   (a) Collateral Attack/Habeas Corpus not available in Superior Courts.

4. Right to Procedural Due Process.

   (a) The procedural due process and statutes enumerated in 66 have not been made available to condemned prisoners.

5. Right to the Equal Protection of the Law.

   (a) Indigent condemned prisoners (a majority of them people of color) are not provided any of the provisional benefits of Proposition 66. Conflict free counsel.
   (b) Indigent funding.
   (c) Fully funded post-trial investigations.
   (d) Inclusion of federally protected rights in the state appellate pleadings.
   (e) Access to the courts.
   (f) Postponement of the Writ of Certiorari to the United States Supreme Court once all state appeals (direct and habeas corpus) and after the federal violations have been adjudicated by the state court process.

6. Right to present an innocence claim to the trial court for consideration and adjudication,

   (a) No such process is available until after trial court and Court of Appeal has accepted and processed Petitioners Writ of habeas corpus.

7. Right to be free from cruel and unusual punishment.

18.

(a) Under the California Supreme Courts Policies Petitioner and other similarly situated condemned prisoners are warehoused for a minimum of <u>THIRTY-FOUR</u>,(34) <u>YEARS</u> without meaningful or adequate appellate review of their direct appeals, and without habeas corpus collateral attack. To date nothing has changed...

(b) Petitioner is filled to dreadful anxiety over the reality that this Stalinlistic nightmare may never end, until I am wrongfully executed.


Petitioner concedes that the violation of Due Process revolves around an

evolving standard within the criminal justice system which takes into account

time, place, and the circumstances...

<u>As Justice Frankfurter observed:</u>

"The requirement of due process is not a fair weather or timid assurance. It must be respected in periods of calm and in times of trouble; it protects aliens as well as citizens. But due process unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Expressing as it does in its ultimate analysis respect enforced by law for that feeling of just treatment which has been evolved through centuries of Anglo-American constitutional history and civilization. Due process cannot be imprisoned within the treacherous limits of any formula (such as policies) Representing a profound attitude of fairness between man and man, <u>and more particularly between the individual and government,</u> due process is compounded of history, reason, the past course of decisions, and a stout confidence in the strength of the democratic faith which we profess. Due process is not a mechanical instrument.. It is not a yardstick... It is a delicate process of adjustment inescapably involving <u>the exercise of judgement by those whom the Constitution entrusted with the unfolding of the process.</u>" 341 US. 123, 162-163."

Petitioner could not have stated it any better. However, Petitioner would add

that the People of California, Lawmakers, courts, and the Governor are all currently

entrenched in Criminal Justice Reform. Some of their efforts have proven successful.

1.  AB-0335: Parole Placement & Release.
2.  AB-1076: Criminal Records, Automatic relief.
3.  AB-1308: Youth Offender, Parole Hearings.
4.  AB-1448: Elderly Parole Program.
5.  AB-1793: Cannabis: Resentencing.
6.  AB-1909: Habeas Corpus - False Evidence.
7.  AB-2226: Crime Victims: Restitution & Compensation.
8.  AB-2765: Proposition 47: Restorative Justice: Sentencing Reduction.
9.  AB-2942: Criminal Procddure: Recall of Sentence.
10. SB-1421: Peace Officers, Release of Records.

11. SB-0260: Youth Offender Parole hearings.
12. SB-0261: Youth Offender Parole hearings.
13. SB-0394: Youth Offender Parole hearings.
14. SB-0519: Youth Offender Parole Hearings.
15. Sb-0625: Juvenile: Honorable Discharge.
16. SB-0843: Prisoners: DNA Testing.
17. SB-1010: Parole, Supportive Housing Pilot Program.
18. SB-1134: Habeas Corpus, New Evidence.
19. SB-1437: Accomplice Liability for Felony Murder.
20. ACA-0012: Death Penalty.

Clearly Due Process is evolving in favor of the Rights of Condemned Prisoners.

Unlike the right to due process, whose precise ingredients may be difficult to measure, the Sixth Amendment Right to Effective Right to Assistance of Counsel is not. It is absolute. See Strickland v. Washington, 466 U.S. 688 (1984).

The Constitutional Guarantee takes on an even greater significance in the capital appellate context. Where the ultimate punishment is death.

Here in California, there are 350 men and women who are without counsel. Some have waited as much as TWENTY-FIVE YEARS without legal representation. Languishing under the threat of execution, under maximum security imprisonment. Courts have generally ignored significant delays in the processing of capital cases. However, this is NOT about the delays, this is about the fact that once these condemned prisoners are appointed counsel, it is NOT for collateral attack. Let me repeat that in case this court missed it. Once the State of California appoints habeas corpus counsel, it is NOT for collateral attack. Policies are very clear on this point. Counsel is LIMITED in his duties to "Executive Clemency/Habeas Corpus." This is a complete denial of counsel for the purpose of challenging the judgement of the trial court and legality of their confinement. Without this post-trial investigative tool to raise the spectre of Ineffective trial counsel the process is defective.

This complete denial of legal representation harkens back to very vile period in this nations history when certain individuals were excluded from the rights and privileges of the ruling class. They could not testify before the courts. They were

20.

not protected by the laws, local or national. They were simply left suspended without any legal recourse. That is exactly what is happening to poor people of color right now, right here in the State of California. Hundreds are without legal representation decade after decade. Denied access to the courts and to make matters worse, rules have been put in place to prevent this court from correcting the injustices. The exhaustion requirement for example...

Petitioner, and all those similarly situation cannot access the state court process to complain about the injustices. The unjust process itself making it impossible to exhaust. Perhaps this is why Congress enacted the provision that this court can waive the exhaustion requirement if it determines that the State is acting in Violation of the Constitution. Petitioner has provided overwhelming evidence that the entire capital appellate process is in Violation of the Constitution of the United States of America. Which is the Supreme Law Of The Land.

Another example of this courts reluctance to correct the State courts lawlessness has come in the form of comity. This is NOT a rule of LAW. It is however, a mere courtesy. Why would a court whose responsibility it is to supervise permit "Lawless State Actions," extend a courtesy to the Lawless Actors? Allowing them to trample on the very constitution we rely upon to preserve our democracy? All 50 states have ratified their constitutions to extend the constitutional protections to all citizens. California is no exception. We agree that when a man, or woman, is hauled into a courtroom and accused of a crime, he or she has the absolute guarantee right to legal representation from a trained professional. Yet, 850 condemned prisoners are being denied that very right.

Voting rights are being jeopardized by digital sabotage and clandestine investigations. Civil rights are under attack in our streets, bullet by bullet. Abortion Rights are back in the forefront of our highest court. The right to

21.

counsel for a person sentenced to death has died right here in California.

Petitioner will spend a decade or more, before conflicted counsel for direct appeal will be appointed. Whoever is appointed will spend four to six years removing all potentially meritorious constitutional violations from the trial court transcript. This court will be duped into believing that the State court judgement is in compliance with the United States Constitution. And cannot go behind the record in search of the truth.

This court now knows the truth. Concealment of constitutional violations that trample on the fundamental principles of fairness and decency that we profess as a democracy must be corrected by this court.

The People can return to the polls and correct their errors every four to six years...

A woman can opt to place her unwanted child up for adoption with a loving family. Civil Rights can be restored when those under color of authority are sentenced to prison for their crimes. And liberty and justice can be restored when a condemned man imprisoned without State remedy reaches out to a United States District Court Justice and asks, do you possess the intestinal fortitude to defend the constitution?

The State of California has acknowledged that it cannot provide Habeas Corpus Counsel for Collateral Attack to Condemned Prisoners. Then for the Love of God and Country, they should not be in the business of killing people.

The question before this court is does the California Supreme Courts interference with the implementation of the Electorates passage of Proposition 66 serve some legitimate government interests? What legitimate interest could possibly be served by the intrusion and elimination of the right to challenge a trial court judgement on appeal? Perhaps the issuance of an Order to Show Cause will prompt an answer to this question that will satisfy Petitioner and this court.

22.

Aside from the restoration of the Great Writ, collateral attack of the judgement, the voters passed another significant milestone. Innocence claims. Included in the provisions of 1509 section (a-d) is the caveat that the trial court cannot dismiss a successive or second habeas corpus petition if it raises a prima facie case for innocence. Habeas corpus and innocence claims. There is a definite theme to the voters logic. Petitioner will attempt to bring light to these provisions.

The voters were given a choice, Prop. 62 would abolish the death penalty altogether. There was no confusion about its purpose. Prop. 66 gave voters the option of keeping capital punishment, while infusing the necessary appellate safeguards to insure that those who had spent decades without due process and collateral attack, and who were innocent, would be afforded an opportunity to challenge their illegal detainment. This is not going to happen for one fundamental reason. California cannot recruit and appoint sufficient numbers of trained habeas corpus attorneys to represent all those who have been wrongfully convicted and warehoused for three decades. The inescapable truth is that California could not opt in to the Anti-Terrorists-Effective Death Penalty Act (AEDPA), in 1996 for the same reason. Twenty-three years later this problem persist. It is a problem that no electorate or courts can ever remedy because prosecutors are seeking and obtaining capital sentences at a much faster rate than this state produces habeas corpus attorneys. This is a fact that must be reckoned with now. There are 350 condemned prisoners warehoused for as long as twenty-five years without counsel. So, the issue is not delays, the issue is legal representation for poor people who have been convicted and sentenced to die. This cornerstone of American jurisprudence cannot simply be ignored decade after decade now that the voters have passed Proposition

66. The new laws are meant to affect change in the way capital appeals are processed. The first principle change is the jurisdiction of the habeas corpus petition. Whether it is because the California Supreme Court has had difficulties processing capital cases fairly, or because the electorate chose to remove the State's High Court from the certain scrutiny that is sure to follow when collateral attack is restored and cases found harmless many decades ago, now present evidence of innocence. We may never know. Irregardless of the reason for the change in jurisdiction the Superior Courts are now responsible for appointment of counsel, funding, investigations and adjudications of federal constitutional claims.

Petitioner asserts that habeas corpus collateral attack and innocence claims could potentially free hundreds of condemned prisoners. Which is precisely what the voters anticipated. Exhibit ( A ) makes clear that despite the courts efforts to recruit qualified attorneys, no attorneys are interested in applying for capital litigation. All other aspects of Prop. 66 are doomed by this reality.

Petitioner contends that the electorate was promised something the state could not deliver. Solutions to a problem the state created. For this reason Petitioner asks this court to issue an Order to Show Cause to the California State Attorney General requiring him to express the plans for the enforcement of Proposition 66? If this court determines that the provisions in Prop. 66 are inoperable, and cannot be achieved, then the majority vote in the (2016) election was 49% in favor of Prop. 62, to abolish the death penalty. And the votes for Prop. 66 should be deemed void or invalid.

<u>CAUSE AND PREJUDICE:</u>

The cause of this action is California's refusal and/or inability to adopt the new provisions enumerated by the electorate in Proposition 66. Condemned prisoners

have engaged in Herculean efforts to challenge the California Supreme Courts promulgated policies and were un-successful. What the pro se capital defendants could not achieve, the voters of California did. Policies are dead. Yet, nothing has been done to enforce or enact the new statutes. Hence, when this court considers the arguments presented herein, consider that under the California Supreme Courts policies condemned prisoners had no rights whatsoever. And, the rights and privileges the electorate sought to restore have not been implemented. So, when Petitioner asserts that there is no effective appellate process to protect his rights, this court should not accept more of the old, and none of the new. Proposition 66 is just as dead as policies. Thus, this state's capital appellate process is without legal foundation and is therefore lawless. The resolution to this petition must be effective and lasting. This court should not be satisfied by 36 more years of unconstitutional procedures and practices.

Petitioner calls this court's attention to Exhibit ( D ). The case of Stephen Moreland Redd v. Kevin Chappell. Case no. 14-6264 Decided December 1, 2014. Justice Sotomayor said the following...

> "At the same time, the California Supreme Court refuses to consider capital inmates pro se submissions relating to matters for which they have a continuing right to representation. See In re Barnett, 31 Cal. 4th 466. I vote to deny the petition for certiorari because it is not clear that Petitioner has been denied all access to the courts. He may for example, seek appointment of counsel for his federal habeas corpus proceedings. See 18 U.S.C. § 3599 (a) (2), and he may argue that he should not be required to exhaust any claims that he might otherwise bring in state court proceedings, as circumstances exist that render the state corrective process ineffective to protect his rights. 28 U.S.C. § 2254 (b)(1)(ii). Moreover, Petitioner might seek to bring a 42 U.S.C. § 1983 suit contending that the state's failure to provide him with counsel to which he is entitled violates the Due Process Clause.

Petitioner asserts that argue here. If the officials of the legislature, judiciary, and the Governor, enact the reforms the voters passed, then the capital

appellate process would experience the reforms the electorate voted for. However, after two years, all of the necessary funding and jurisdictional questions have been settled. The Superior courts are now responsible for the appointment of habeas corpus counsel. And yet, the Habeas Corpus Resource Center, founded and funded by the California Supreme Court, its now without a board of directors, and the practice and procedures are consistent with Policies since 1994. It should come as no surprise that attorneys with integrity and honesty do not want to be a party to this process? The voters have removed the California Supreme Courts jurisdiction over the appointment of habeas corpus appointments. The Supreme court should not be involved with the Center (HCRC) that appoints counsel. Independent attorney with autonomy would be free to challenge their clients illegal detention due to policies practiced by the California Supreme Court over the past 36 years. Using the restored collateral attack to attack the policies that should have never been promulgated and enforced in the first place.

To fully appreciate the determination of the California Supreme Court's efforts to defeat the provisions in Proposition 66, we must examine what the provisions will produce if implemented. First, because of the innocence claims, nearly two hundred habeas corpus petitions claiming innocence would be filed and heard within five years. Accounting for just fifteen percent of condemned prisoners being innocent, that's one-hundred and forty (140) individuals. Once the federal violations that are normally concealed are presented for adjudication, hundreds of additional convictions would be overturned for prosecutor and judicial misconduct. And all of the remaining petitions will assert that they never had a collateral attack, fully funded investigation of their claims, and file suspicious innocence claims in order to legitimize their pleadings. Within ten years 92.8% of those currently warehoused would be re-tried and/or set free because of the prejudicial impact of policies.

Petitioner asserts that is what the voters intended in order to

26.

to reduce the number of people on death row. Give those who are truly innocent an opportunity to be heard, and eliminate the back side of the backlog.

If the California officials were truly interested in the reforms passed by the electorate, they would have surrendered jurisdiction to the chairman of the local committees under <u>Rules of Court, 4.572 (g)</u>. And all habeas corpus attorneys would be notified that they can chose simple or complex cases from their communities, and be paid commensurate with their private counterparts. Capital habeas petitions would be filed within one to two years, and the attorney would be promised autonomy for the duration of their representation. The claims involved in capital habeas litigation are well known and without cumbersome procedural mazes, could be financially and personally rewarding. Freeing innocent people from a state run warehouse is always satisfying. To do nothing, and just watch and wait is unacceptable. It will produce more of the same problems found by <u>The California Commission for the Administration of Justice.</u> <u>Professor Gerald Uelman</u> noted these eight factors as contributors to the dysfunctional California's capital appellate process.

> "The CCFAJ attributed the dysfunction in California's capital appeals, and habeas corpus systems to: (1) California death penalty law which makes up 87% California's first degree murders, death eligible. (2) The excessive delays and post-conviction proceedings due to this courts inability to recruit qualified counsel. (3) Rampant ineffective assistance of counsel at the trial court level. (4) The failure of the California courts and legislature to reduce the risks of wrongful convictions resulting from erroneous eye-witness identifications, false confessions, and tstimony from in custody informants. (5) The lack of adequate funding for the appointment and performance of trial counsel in death cases in full compliance with <u>ABA guidelines.</u> (6) The low level of income provided to private attorneys handling death penalty appeals. (7) The failure to pay post-conviction counsel at rates commensurate with high quality representation that reflect the extraordinary responsibilities in death penalty representation. (8) The failure to provide sufficient funding to permit state habeas counsel to investigate each death row inmates federal constitutional claims. <u>iii CCFAJ. Final Report,</u> at p. 119-137."

These inherent defects in the state run death machine have contributed to the number of innocent men and women on death rows.

It was this type of information from the Commission that motivated the voters to chose reform over abolishment.

The enactment of the provisions in Proposition 66 create a very real and actual conflict of interest because the Superior Courts answer to the Supreme Court, but the Superior Courts are responsible for implementing and adjudicating claims that may result in the demise of Supreme Court justices seats on the bench.

If this court refuses to exercise its judgement and authority over the implementation of the People's vote, then Petitioner and those similarly situated will face the same fate as those who have been warehoused here without recourse for 36 years. Allowing the California Supreme Court the opportunity to appoint direct appeal counsel first, and derive at a final judgement before the appointment of counsel for collateral attack. Once this stage of the process has been achieved no habeas corpus/collateral attack will ever occur. And the California Supreme Court judges will continue to benefit from their unilateral decision to make their own laws which benefit them financially and politically. The constitution of the United States and the rights and privileges of United States citizens be damned. When will the federal courts intervene? When there is a 1,000 condemned prisoners? Or, when the wrong man or woman is executed? Sitting on the sidelines may have been an option when confronted with a challenge to unconstitutional policies that entailed the jurisdiction of the State Supreme Court. However, different considerations are now the guiding principles. The voters of California have reserved onto themselves the right to legislate. Once enacted it is the responsibility of the California State Attorney General to enforce all laws.

This court should act decisively and aggressively to restore fairness and equality to the criminal and civil appellate procedures. Or as Justice George

lamented... "If nothing is done to correct the systems flaws soon, the system will collapse under its own weight." At that point, the voters will look for someone to explain why their restoration of habeas corpus/collateral attack, and innocence claims were not implemented? The Rights of the People to govern themselves is at the heart of this petition. This court must not sit idle while the votes of the People are vanquished by those who claim to defend, honor, and uphold the United States Constitution of America. Land of the free, home of the brave, and all that good stuff.

Without this court's immediate and aggressive intervention the prejudice is very real. 34 more years of false imprisonment without any appellate remedies.

CONCLUSION:

Petitioner asserts that California State officials efforts to recruit new attorneys for appointments to capital appeals is nothing more than a sham.

The voters under Proposition 66 made two fundamental changes in an attempt to change the way attorneys are selected and appointed in capital cases. First, they turned over jurisdiction of habeas corpus collateral attack to the superior courts. Secondly, the voters disbanded the Board of Directors of the Habeas Corpus Resource Center. Petitioner contends that disbanding the Board of Directors was not to give the California Supreme Court exclusive authority of the operation of the Habeas Corpus Resouce Center (HCRC) as it has. It was to create a new board. And the decision to transfer jurisdiction from the California Supreme Court to superior courts, was not to allow the California Supreme Court to continue making appointments through their HCRC operation.

Hundreds of new job offerings opened up for attorneys, and none of them want to participate. Many of them now qualify, and the private sector is not over burdened. So why are qualified attorneys refusing to get involved with saving lives?

The reason is simple, nothing has changed. Superior courts are not making appointments, HCRC is. All qualified attorneys know that working for HCRC means working under the California Supreme Court. And no one wants to participate in a continuation of their dysfunctional policies.

The first order of any genuine change in an effort to recruit new attorneys would be an assurance that this is not business as usual. The jurisdiction of habeas corpus, "and all related matters,' belongs to the superior courts now. The control of funding should also be under their control. Just as appointments, funding, and supervision of investigations, etc. And all matters regarding the defense of the their clients, are reliant upon the statutes and constitutional principles, not any demands from the California Supreme Court, who no longer controls any aspect of habeas corpus.

Without this basic fundamental change, California will intentionally fail in its attempts to recruit new lawyers into the ranks of the old dysfunctional capital appellate process. As Presiding judge Vander Feer admitted, despite all of their efforts to recruit new attorneys no attorneys have signed up. See Exhibit ( A ).

See Government Code § 62882. Petitioner is entitled to the appointment of habeas corpus counsel now. California state officials are under the impression that this principle can be ignored, while they continue to incarcerate Petitioner. Even now that Gov't Code 62882 is backed up by the California voters, who asserted the right to have habeas corpus counsel appointed by the trial court, (not HCRC) as it does now. State officials continue to ignore this fundamental right to Petitioner. This is in direct violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Additionally, all other rights enumerated within the provisions of Proposition 66 ineffective to protect the rights of Petitioner

All rights spring forth from the basic right to counsel. Funding, investigation, presentation and adjudication of Petitioner's claims. They all depend upon the cornerstone of appointment of counsel. As a consequence of the states actions, there is no effective state appellate process to protect the rights of Applicant/Appellant/Petitioner. Exhaustion is not required.

Currently, the State of California cannot recruit attorneys to participate in their dysfunctional process. Once again the Will of the California voters is thwarted. State officials expect condemned prisoners, who are suffering under this illegal detention, and the voters, who demanded changes, to sit back and do nothing as they continue with business as usual. Any attorneys entering the capital appellate process are directed to HCRC, (more policies) while superior courts have had their jurisdiction, and all matters related to habeas corpus usurped by the California Supreme Court. State officials have no intention of turning over funding, appointments, and new recruits to superior courts.

It is the dawn of a new day. For the past 36 years the California judiciary has been allowed to stripe condemned prisoners of all rights guaranteed to them as citizens of the United States. All attempts to break these chains of illegal detention were met by passive federal judges who feared it would appear as if they were aiding convicted murderers rather than enforcing the United States Constitution.

On August 24, 2017 the most powerful political force on Earth, the People of this democracy, declared they want changes. Gone are the policies of old. The laws in effect now have the backing and the blessings of the People of California. The voters went into the voting booths and RESTORED all those rights that the State striped away. Despite this, the State has decided to stand against the Will of the People and continues to violate the United States Constitution, and the rights of condemned prisoners who languish for decades without appellate remedies...

31.

Petitioner has faith in the democratic process that restored the Great Writ and allows for claims of innocence. It demonstrates that the People of this great state understand the tyranny that has prevailed in this state over the past three and a half decades. Petitioner is reminded of a sentence from the Declaration of Independence.

> "We hold these Truths to be evident, that all Men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the Pursuit of Happiness - That to secure these Rights, Governments are instituted among Men, deriving their just Powers from the Consent of the Governed, that whenever any form of Government becomes destructive of these Ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such Principles, and organizing its Powers in such form, as to them shall seem most likely to effect their Safety and Happiness..."

> ... And be it not forgotten...

> "A Prince, whose character is thus marked by every act which may define a tyrant, is unfit to be the Ruler of a free People."

The People have declared their abolishment of Policies. That tyrant is no longer fit to rule.

The People have declared a new rule of law, but it cannot protect the rights of Petitioner as long as the Tyrant remains in control of this State Court Process.

Petitioner prays this court will trust the Will of the People effect the necessary change to protect the rights of Petitioner.

PRAYER FOR RELIEF:

1.   Consistent with the facts and information presented herein, Petitioner ask this court to VACATE the Judgement and Sentence of the Los Angeles Superior court in case No.

Further, to REMAND the case back to Los Angeles Superior Court for re-trial. Consistent with the facts and information herein, the State should be barred from seeking capital murder changes with special circumstances until and unless this court is satisfied the State has provided an appellate process to protect the rights of Petitioner should a wrongful judgement be once again obtained.

2.   In the alternative, Petitioner ask this court to GRANT Petitioner's request for the APPOINTMENT OF COUNSEL, and issue an ORDER TO SHOW CAUSE, to the California Attorney General, to determine whether State officials plan to implement any of the provisions within Proposition 66 which are meant to restore the rights that effectively protect Petitioner from illegal detention and wrongful conviction.

In the alternative, if this court determines that the State sought and obtained a capital conviction and sentence against Petitioner with knowledge and intent to indefinitely detain Petitioner without rights, then Petitioner ask this court to DISMISS the criminal indictment with PREJUCIDE and release Petitioner from custody immediately.

3.   Petitioner asks this court to take whatever action necessary to force California State Officials to comply with the wishes of the People. Whatever forms the corrective process might take in order to bring California State Officials into compliance with the provisions of Proposition 66.


IT IS SO PRAYED.

I declare under penalty that the foregoing facts and information contained within this Petition for a Writ Of Habeas Corpus are true and correct to the best of my knowledge.

Dated: 12·26·019

James Dawntay Ellis,
In Pro se

Attachment: (1)



**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF SAN BERNARDINO**
Victorville District
14455 Civic Drive, Suite 200
Victorville, CA 92392
www.sb-court.org

**\*\*CORRECTED\*\***
## MINUTE ORDER

Case Number: FVI902692-4                                    Date: 6/16/2017

Case Title: People of the State of California vs. JAMES DAWNTAY ELLIS

| | | | |
|---|---|---|---|
| Department V3 - Victorville | Date: 6/16/2017 | Time: 1:30 PM | Sentencing |

Charges:  PC12022.53(D)-E, E-SG-PC186.22(B)(1), E-XE-PC12022.53D-E(1, PC187(A)-F, PC187(A)-F, PC12022.53(D)-E; E-SG-PC186.22(B)(1), E-XE-PC12022.53D-E(1, PC186.22(A)-F, PC667(A)(1)-E, PC1170.12(A)-(D)-A, PC1192.7(C)(8)-E

Judicial Officer: Eric M Nakata
Judicial Assistant: Guadalupe Mora
Court Reporter: Glenora Melendez
Bailiff: Z Heiner

Appearances
District Attorney Britt Imes
Conflict Panel George Wright & David Call (Capital Conflict Panel)
Defendant present in custody

Proceedings
1:37 PM
Court reconvenes all parties present.
The parties stipulated that they have received the Probation Report in a timely fashion.
The Court has read and considered the following:
Defense Motion for New Trial,
People's Opposition, Defense Reply Brief, and People's Reply to Defense's Reply Brief.
1:39 PM
Motion for New Trial Heard
Arguments presented by the Defense.
George Wright

Arguments presented by the People.
Britt Imes

Rebutted by the Defense.
George Wright

Defense counsel submits
Rebutted by the People.
Britt Imes

37 CT        10320

People submit
Defense Motion For New Trial is Denied.
Findings stated on the record by the Court.

The People make an oral request for the record to adopt #'s 2-8 & 9-10 from the People's Reply Brief.
The Court will only adopt #'s 2-8.
2:04 PM
The Court has read and considered the following:
Defense Motion for Modification of Death Verdict and People's Opposition.
Motion Heard
Motion for Modification of Death Verdict.
Arguments presented by the Defense.
David Call

Defense counsel David Call submits
Arguments presented by the Defense.
George Wright

Arguments presented by the People.
Britt Imes

People submit
Rebuttal by the Defense.
George Wright

Defense counsel submits
Defense Motion for Modification of Death Verdict is Denied.
Findings stated on the record by the Court.

The Court finds that the aggravating evidence as to Mr. Ellis substantially outweighs the mitigating evidence,
warranting the death penalty and supporting the jury's conclusions to that effect.
The Court directs the court reporter to prepare a transcript of today's proceedings and incorporate the transcripts into
the record.

Statement of Reasons for Denial of Automatic Motion to Modify Sentence signed by the Court and filed.
Motion - New trial
and for Modification of Verdict filed
Order Signed and Filed
Commitment and Judgment of Death
2:52 PM
Recess declared.
3:08 PM
Court reconvenes all parties present.
Court has read and considered Probation Officer's Report dated 01/27/17.
Probation Officer's Report filed
Signed and filed
Formal arraignment for Pronouncement of Judgment is waived; no legal cause why Judgment should not now be
pronounced.
3:10 PM
Victim advocate Alma Arenas from District Attorney's office present in court for those who are giving a victim impact
statement.
Victim(s) statement given by Desire Rellford in open court.  Also present Desire's younger brother Deon who declined
to make a statement.
3:13 PM

Victim(s) statement given by Debra Rellford in open court.
3:16 PM
Victim(s) statement given by Shareecs Rellford in open court.
3:18 PM
Victim(s) statement given by Derszane Rellford in open court.
3:20 PM
Statement given by the Defendant James Ellis in open court.

Findings/Advisals
Court finds defendant NOT able to pay for attorney fees
Court finds defendant NOT able to pay for Pre-Sentence Rpt.
Court finds vehicle was NOT used during offense - VC13350
Court orders DOC to obtain samples pursuant to PC296
Court retains jurisdiction on restitution - PC1202.46
Restitution Fine stayed - PC1202.45 (DOC) $10,000.00
Restitution Fine imposed - PC1202.4 (DOC) $10,000.00
Ordered Fees to be Collected by DOC
Const./court operations fee of $70 per conviction (DOC)    $210 (per conviction)
Weapon ordered disposed of pursuant to PC18005(c)
Court fully advises Defendant of Appeal Rights


Sentencing Information
Probation is DENIED and sentence is imposed as follows:
Court orders State Prison as to Count:
003. PC186.22(A)-F: Participate in Crim Str Gang

Court orders State Prison as to Count:
999. PC667(A)(1)-E: W/Prior Felony Convict: Serious Fel.Conv

Sentenced Pursuant to PC1170.12(c)(1)/ 667(e)(1)
Principal count deemed count #: 3

Sentenced to State Prison
As to Count 003; the Court imposes the Upper term of 6 Years 0 Months

Credit Time Served  2742 Days Actual 0 Days Conduct Credit PC 2933.2 (No Credit) for a Total of 2742 Days

Defendant remanded to the custody of the Sheriff to be delivered to California Department of Corrections at 1 Chino - California Institution For Men

Sentenced to State Prison
As to Prior 999; the Court imposes the term of 5 Years 0 Months
  Consecutive With Count: 3

Court orders State Prison as to Count:
001. PC187(A)-F: Murder

Sentenced to State Prison
As to 001, Defendant is sentenced to Death
  Consecutive With Count: #3

Court orders State Prison as to Count:
1. PC12022.53(D) CAUSED INJ W/F'ARM DURING FLNY

10322

Sentenced to State Prison
As to 1, the Court imposes 25 Years to Life
  Consecutive With Count: #1

As to allegations PC186.22(B)(1) and PC12022.53D/E(1) as to Count 1 the Court stays said sentence pursuant to PC654.

Court orders State Prison as to Count:
002. PC187(A)-F: Murder

Sentenced to State Prison
As to 002, Defendant is sentenced to Death
  Consecutive With Count: #3

Court orders State Prison as to Count:
002. PC12022.53(D) CAUSED INJ W/F'ARM DURING FLNY

Sentenced to State Prison
As to 002, the Court imposes 25 Years to Life
  Consecutive With Count: #2

As to allegations PC186.22(B)(1) and PC12022.53D/E(1) as to Count 2 the Court stays said sentence pursuant to PC654.

Sentenced for a total indeterminate and determinate term of:   11 years determinate, 50 years to life indeterminate and death

The Court offers the defendant appointment of post-conviction counsel pursuant to Government Code Section 68662.
The defendant accepts appointment of post-conviction counsel.
The Court finds the defendant indigent. The Court appoints both habeas and appellate counsel (i.e. state public defender), under Prop 66.

The Court adopts the People's version of the facts under the PC190.4 Motion.

The defendant is ordered remanded to the custody of the Sheriff of San Bernardino County without bail to be delivered to the warden of San Quentin, California within 10 day from today's date.

Custody Status
Case Custody - State Prison
Clerk's Office to prepare Prison Abstract

Commitment - State Prison printed

======MINUTE ORDER CORRECTED ON 06/30/17=========

==Minute Order changed or corrected by GMORA to dispo hearing. Changes made are as follows: Add verbiage of post-conviction counsel under Prop 66==

Exhibit A.



COPY

1  Superior Court of California
   County of San Bernardino
2  **247 West Third Street, 11ᵗʰ Floor**
   **San Bernardino, California 92415**

3

4

5

6

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
VICTORVILLE DISTRICT

**SEP 2 5 2019**

BY _Andrea Olvera_
ANDREA OLVERA, DEPUTY

7              **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                  **IN AND FOR THE COUNTY OF SAN BERNARDINO**

9

10     People of the State of California,          Case No. FVI902692-4

11                      Plaintiff,                  (Capital Case)

12

13     v.                                          ORDER CONFIRMING REQUEST

14                                                 FOR APPOINTMENT OF COUNSEL

15     James Dawntay Ellis,

16                      Defendant.

17

18              Defendant James Dawntay Ellis, filed a motion requesting this Court

19     accept jurisdiction and appoint habeas corpus counsel. In particular, Ellis seeks

20     the appointment of qualified counsel from a local pool as he asserts counsel who

21     participated in the prior appointment process of our Supreme Court are

22     conflicted. Ellis further contends this Court is required to appoint from a local pool

23     because a goal of the changes enacted by Proposition 66 was to expedite the

24     resolution of capital cases.

25              This Court is responsible for offering counsel to Ellis for the purposes of

26     filing a petition for writ of habeas corpus under Penal Code section 1509. (See

27     Govt. Code, § 68662.) This Superior Court has not adopted local rules to

28     establish local qualifications and does not have any counsel, on any panel of

29     attorneys accepting appointed service in this Superior Court, qualified to handle a

30     habeas corpus matter concerning a judgment of death. The County of San

31     Bernardino has also reported to this Superior Court that the Office of the Public

32     Defender does not have any counsel qualified to handle capital habeas corpus

33     proceedings. The Habeas Corpus Resource Center is required to consolidate the

34     names of any counsel statewide who has been determined to meet the

35     qualifications to be appointed and make that list available to superior courts on its

36

1    website. The website currently states "There are currently no counsel designated
2    qualified by appellate district regional committees."
3          This Superior Court sent recruitment flyers to all attorneys on its panel for
4    LWOP and capital cases, as well as the contractor organizing its conflict panel,
5    and 27 other organizations. This Superior Court has yet to have any counsel
6    agree to accept an appointment in a capital habeas corpus proceeding.
7          Additionally, this Court is required, whenever possible, to appoint counsel
8    first for those persons subject to the oldest judgments of death. (Cal. Rules of
9    Court, rule 4.561(b).) At present, Ellis's 2017 judgment places him 27th in line for
10   the appointment of habeas corpus counsel in this Superior Court. This Court's
11   appointment is to occur after it receives a notice from the Habeas Corpus
12   Resource Center that Ellis's case is among the oldest cases in which counsel
13   has yet to be appointed. (See Cal. Rules of Court, rule 4.561(e)(1).)
14         As Ellis has yet to be appointed counsel, and such an appointment is not
15   likely for years given the backlog in cases pending appointment, any contention
16   about any group of counsel being conflicted due to prior participation in death
17   penalty cases through our Supreme Court's panel is not yet ripe.
18         Accordingly, this Court will appoint counsel for Ellis for the purposes of
19   filing a petition for writ of habeas corpus under Penal Code section 1509 when it
20   has qualified counsel available for appointment and when Ellis's judgment is
21   among the oldest yet to receive an appointment.
22
23
24   Dated:  September 25, 2019
25                                                     Hon. John P. Vander Feer
26                                                     Presiding Judge
27
28
29
30
31
32
33
34
35
36

Exhibit B.

1    Michael J. Hersek (Bar No. 142065)

2    HABEAS CORPUS RESOURCE CENTER
     303 Second Street, Suite 400 South

3    San Francisco, California 94107

4    Telephone:    (415) 348-3800
     Facsimile:     (415) 348-3873

5    E-mail:       docketing@hcrc.ca.gov

6          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

7            **FOR THE COUNTY OF SAN BERNARDINO**

8    PEOPLE OF THE STATE OF       Case No. FVI902692-4

9    CALIFORNIA,
                           **CAPITAL CASE**

10           Plaintiff and Respondent.
                           Related to: California Supreme Court No.

11       v.                           S242792 (on direct appeal).

12    JAMES DAWNTAY ELLIS,        **MOTION TO VACATE ORDER**

13           Defendant and Petitioner.    **APPOINTING COUNSEL ON HABEAS**
                                 **CORPUS;**

14

15                             **DECLARATION OF MICHAEL J.**
                            **HERSEK IN SUPPORT THEREOF;**

16                             **PROPOSED ORDER**

17

18                             Hon. Judge Eric M. Nakata
                            Dept: V3 - Victorville

19

20         On June 16, 2017, this Court sentenced petitioner James Dawntay Ellis to death. At

21   that proceeding, the Court appointed the State Public Defender as "both habeas and

22   appellate counsel." Ex. 1 at p.4. On August 8, 2018, this Court vacated the portion of its

23   order appointing the State Public Defender as habeas counsel, and appointed the Habeas

24   Corpus Resource Center (HCRC) in its place. (*See* Hersek Declaration at ¶ 2.)

25         This court's order should be vacated for two reasons. First, no new habeas corpus

26   appointments have been made in capital habeas corpus proceedings since Proposition 66

27   (Prop 66) went into effect. (*See* Hersek Declaration at ¶ 3.) This pause in appointments is

28   because Prop 66 provides the Judicial Council 18 months from the proposition's effective

1   date to establish new rules of court to govern the disposition of capital habeas corpus

2   actions in California. (Pen. Code § 190.6, subd. (d).)[1] These new rules, which go into

3   effect April 25, 2019, provide the Superior Courts with the procedures they must follow

4   when appointing counsel in capital habeas corpus proceedings. (*See* Hersek Declaration

5   at ¶ 3.)

6          In relevant part, the new rules of court require the prioritization of appointments in

7   all death cases in which the defendants have requested and are awaiting appointment of

8   habeas counsel.  Currently, more than 350 inmates await appointment of habeas counsel,

9   with many inmates having requested habeas counsel more than 20 years ago.  Because the

10   decision to appoint counsel necessarily involves the allocation of limited state resources,

11   courts must make appointments in a fair and equitable way.  Accordingly, the rules of court

12   approved by the Judicial Council require the Superior Courts to place the names of newly

13   death-sentenced inmates on a waiting list maintained by HCRC.  Inmates will then receive

14   counsel as counsel becomes available, with inmates who have been waiting the longest

15   receiving counsel first.  Similar prioritization procedures have been in place for more than

16   twenty years and are necessary for the fair and orderly appointment of counsel, as well as

17   the distribution of limited state resources, for inmates living under sentence of death in

18   California, many of whom have been awaiting counsel decades longer than Mr. Ellis. (*See*

19   *id.)*

20          Second, HCRC cannot accept the appointment in Mr. Ellis's case as this time.

21   HCRC is both a resource center for private counsel who accept appointments in post-

22   conviction death penalty cases, and an office that accepts appointments.  HCRC's statutory

23   enabling language does not *require* HCRC to accept any particular appointment, and it

24   cannot accept an appointment before first determining whether it has qualified staff

25   available who can immediately begin working on the case and competently prepare the

26

27   [1]   The effective date of the provisions of Prop. 66 is October 25, 2017. *Briggs v. Brown* (2017) 3 Cal.5th 808, 862, as modified on denial of reh'g (Oct. 25, 2017) ["The

28   effective date of Proposition 66 shall be the date our opinion becomes final."].

2

1    habeas petition without compromising their ethical duties to their existing clients.  This is
2    particularly necessary given that a petition must be filed one year after appointment of
3    counsel.   In addition, before accepting any appointment, HCRC must first determine
4    whether doing so would create any conflicts of interest with cases it has already accepted.

5         As of the filing of this motion, HCRC's 27 attorneys represent 69 inmates sentenced
6    to death in state and federal court.  The entity is currently litigating 10 hearing cases with
7    Orders to Show Cause in the superior courts.  Since the passage of Prop 66, upon request
8    from the Supreme Court, HCRC has recently accepted several "hand off" cases – cases in
9    which appointed habeas counsel had to withdraw their representation.      Accordingly,
10   HCRC's current workload obligations make it impossible to accept a new 1-year case at
11   this time.  (*See* Hersek Declaration at ¶ 4.)

12        Moreover, HCRC did not receive timely notice of the Court's appointment.  (*See*
13   Hersek Declaration at ¶¶ 2, 4.)  Under newly enacted Penal Code 1509, subd. (c), as noted,
14   a petition for a writ of habeas corpus must be filed in the Superior Court within one year
15   of the date counsel is appointed.  (Pen. Code § 1509(c).)  Because HCRC did not receive
16   notice of its appointment until several months after it was made, it did not take any steps
17   to begin work on Mr. Ellis's case, and it is unable to do so at this point.  (*See* Hersek
18   Declaration at ¶ 4.)  It is thus of paramount importance that the Court vacate its order
19   appointing HCRC as habeas corpus counsel to Mr. Ellis in order to reset the statute of
20   limitations, giving any habeas corpus counsel that will eventually be appointed to Mr.
21   Ellis's case the full 1-year period of time to complete and file a petition for a writ of habeas
22   corpus.
23   //
24
25
26
27
28

Motion to Vacate Order Appointing Counsel on Habeas Corpus

1

2          For these reasons, undersigned counsel asks this Court to vacate its order appointing

3   HCRC as habeas corpus counsel to Mr. Ellis.

4

5      Dated:  January 14, 2019                 Respectfully submitted,

6                                              HABEAS CORPUS RESOURCE CENTER

7                                      By:

8                                              Michael J. Hersek

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Motion to Vacate Order Appointing Counsel on Habeas Corpus

# DECLARATION OF MICHAEL J. HERSEK

I, Michael J. Hersek, on information and belief, declare as follows:

1.      I am an attorney admitted to practice before this Court.  I am the Acting Executive Director of the Habeas Corpus Resource Center (HCRC).

2.      On November 9, 2018, I received an email from Ms. Sarah Chester, a California Appellate Project (CAP) staff member, relating to *People v. James Dawntay Ellis*, No. FVI902692-4, a capital case from this Court.  CAP conducts a limited review of the record in capital cases to assist the California Supreme Court in the appointment of counsel.  Ms. Chester informed me that a CAP staff member had reviewed a minute order in Mr. Ellis's case from June 16, 2017.  That minute order showed that, on that date, the Court appointed the State Public Defender as counsel for both the automatic appeal of Mr. Ellis's conviction and sentence of death, and for the purposes of the presentation of a writ of habeas corpus on Mr. Ellis's behalf.  Ms. Chester attached to her email a copy of the minute order reflecting the appointment, which I have attached.  *See* Ex. 1.  Ms. Chester also told me that Heather Leigh Hardwick, another member of CAP's staff, had been in contact with a court reporter from the San Bernardino Superior Court.  The reporter told Ms. Hardwick that on August 14, 2018, there was a second hearing relating to Mr. Ellis's representation.  The reporter told Ms. Hardwick that at the August hearing the Court removed the State Public Defender as habeas counsel for Mr. Ellis, and appointed HCRC in its place.  The CAP staff members provided me with a copy of the minute order from the August 2018 proceeding, which I have attached.  *See* Ex. 2.  The minute order is incomplete, and does not contain any information about the proceedings that took place that day.  Critically, HCRC was not served with a copy of this minute order, or otherwise notified of the appointment.

3.      Since the passage of Proposition 66 (Prop 66), the California courts have not made any appointments in new capital habeas corpus actions.  This pause in appointments has taken place in order to allow the Judicial Council to comply with its mandate under Prop 66 of writing new rules that will govern the disposition of capital habeas corpus

5

actions in California.  Those rules, which are set to go into effect on April 25, 2019, will provide the Superior Courts with procedures for identifying and appointing qualified counsel to death sentenced inmates in an orderly fashion.  The Court's August 14, 2018 order does not comply with those procedures.

4.     In addition, HCRC is unable to accept an appointment in Mr. Ellis's case at this time.  HCRC is a state-wide government entity within the Judicial Branch.  Its statutory enabling language does not require it to accept any particular appointment in any given case.  Before accepting an appointment, HCRC must first determine if it has staff available who can competently complete the petition within the allotted mandatory timeframes without compromising their ethical duties to their other clients.  HCRC also must examine any potential new appointment to determine if accepting the appointment would create a conflict of interest with its current case obligations.  As of the filing of this motion, HCRC has accepted a number of cases on which its staff is fully engaged, and it does not have available staff to provide Mr. Ellis competent representation.  Furthermore, because HCRC did not receive notice of its appointment, it has not taken any steps to begin work on Mr. Ellis's case.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States and the State of California on January 14, 2019.

_____
Michael J. Hersek
Interim Executive Director of the Habeas Corpus
Resource Center

6

Declaration of Michael J. Hersek

Michael J. Hersek (Bar No. 142065)
HABEAS CORPUS RESOURCE CENTER
303 Second Street, Suite 400 South
San Francisco, California 94107
Telephone:    (415) 348-3800
Facsimile:    (415) 348-3873
E-mail:       docketing@hcrc.ca.gov

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN BERNARDINO

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, <br><br> Plaintiff and Respondent. <br><br> v. <br><br> JAMES DAWNTAY ELLIS, <br> Defendant and Petitioner. | Case No. FVI902692-4 <br><br> **CAPITAL CASE** <br><br> Related to:  California Supreme Court No. S242792 (on direct appeal). <br><br> **[PROPOSED] ORDER VACATING ORDER APPOINTING COUNSEL ON HABEAS CORPUS** |

On August 14, 2018, this court appointed the Habeas Corpus Resource Center as habeas corpus counsel for the defendant and petitioner, James Dawntay Ellis.  For good cause shown, that order is hereby vacated.  Mr. Ellis will be placed on a list of San Quentin inmates awaiting appointment of habeas corpus counsel.

IT IS SO ORDERED.


Dated: _____    By: _____
                                 Judge of the Superior Court
                                 San Bernardino

7

[Proposed] Order Vacating Order Appointing Counsel on Habeas Corpus

Exhibit C.

1  MARY K. MCCOMB
   STATE PUBLIC DEFENDER
2  BAR NO. 132505
   1111 BROADWAY, SUITE 1000
3  OAKLAND, CA 94607
   TELEPHONE: (510) 267-3300
4  FACSIMILE:   (510) 452-8712
   E-MAIL: MCCOMB@OSPD.CA.GOV
5

6             IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

7                IN AND FOR THE COUNTY OF SAN BERNARDINO

8

9  PEOPLE OF THE STATE OF CALIFORNIA,        No. FVA701267-1

10        Plaintiff and Respondent,          (Cal. Supreme Court No. S242792)

11

12  v.                                        (Proposed) ORDER VACATING
                                              APPOINTMENT OF COUSNEL
13  JAMES DAWNTAY ELLIS                       ON DIRECT APPEAL

14
         Defendant and Appellant.
15

16

17        On June 16, 2017, the State Public Defender was appointed as counsel for defendant

18  and appellant James Dawntay Ellis on the appeal of his death penalty conviction. On

    August 14, 2018, that order was reaffirmed. For good cause shown, these orders are hereby
19
    vacated, and the matter referred to the California Supreme Court for appointment of
20
    counsel.
21

22  DATED:

23

24                                          _____
                                            JUDGE OF THE SUPERIOR COURT
25

26

27

28
                                            6

# DECLARATION OF MARY K. MCCOMB

1. I am an attorney licensed to practice law in the State of California. I am the State Public Defender.

2. On November 13, 2018, I received an email from Ms. Sarah Chester, a California Appellate Project (CAP) staff member, relating to *People v. James Dawntay Ellis*, No. FVI902692-4, a capital case from this Court. CAP conducts a limited review of the record in capital cases to assist the California Supreme Court in the appointment of counsel on the automatic appeal. Ms. Chester informed me that a CAP staff member had reviewed a minute order in Mr. Ellis's case from June 16, 2017. That review showed that on June 16, 2017, this Court appointed the State Public Defender as counsel both for the automatic appeal of Mr. Ellis's conviction and sentence of death, and for the purposes of the presentation of a writ of habeas corpus on Mr. Ellis's behalf. Ms. Chester attached to her email a copy of the minute order reflecting the appointment, which I have attached. (Appendix A.) The Office of the State Public Defender (OSPD) was not served with a copy of this order.

3. Ms. Chester also informed me that Heather Leigh Hardwick, a member of CAP's staff, had been in contact with a court reporter from the San Bernardino Superior Court, and that the court reporter told Ms. Hardwick that on August 14, 2018, there was a second hearing relating to Mr. Ellis's representation. The reporter told Ms. Hardwick that at the August hearing the appointment of the State Public Defender as counsel on the automatic appeal was affirmed, and that the State Public Defender was removed as habeas counsel and the Habeas Corpus Resource Center was appointed.

4. The CAP staff member provided me a copy of the minute order from the August 2018 proceeding, which I have attached. (Appendix B.) That minute order is incomplete and does not contain any information about the proceedings on that day. OSPD was not served with a copy of this minute order.

5. My assistant has left voice mails to both the court reporter from that day and to the

1  responded and OSPD has been unable to obtain the transcript for the August 14, 2018
2  hearing.

3      6.  This Court's order on June 16, 2017, appointing the State Public Defender as
4  appellate counsel, as well as its order affirming that appointment on August 14, 2018, was
5  improper. Under California Constitution, Article 6, section 11, the California Supreme
6  Court "has appellate jurisdiction when judgment of death has been pronounced." (See also
7  Pen. Code, § 1239, subd. (b); California Rules of Court (Rules), Rule 8.600(a) ["if a
8  judgment imposes a sentence of death, an appeal by the defendant is automatically taken
9  to the Supreme Court"]) Attorneys in death penalty appeals are appointed by the California
10  Supreme Court. (See Rule 8.605 [defining the minimum qualifications for attorneys
11  appointed by the Supreme Court in death penalty cases].) The California Supreme Court,
12  not this Court, has the responsibility and authority to appoint counsel for the automatic
13  appeal of a capital case.

14      7.  Proposition 66 did not alter the California Supreme Court's exclusive jurisdiction
15  to appoint counsel for automatic appeals from sentences of death. Penal Code section
16  1239.1, subdivision (a), enacted by Proposition 66, provides: "It is the duty of the *Supreme*
17  *Court* in a capital case to expedite the review of the case. The court shall appoint counsel
18  for an indigent appellant as soon as possible." (Italics added.) Clearly, under Proposition
19  66 the California Supreme Court, not the superior court, has the responsibility to appoint
20  counsel on an automatic appeal in a death penalty case.

21      8.  I telephoned Mr. Jorge Navarette, the Court Administrator and Clerk of the
22  California Supreme Court, and asked him how to correct the appointment. He advised me
23  to make a motion in the San Bernardino County Superior Court to vacate the order
24  appointing counsel. A proposed order accompanies this motion.

25  //
26  //
27  //
28

1    I declare under penalty of perjury that the foregoing is true and correct. Signed this

2  10th day of December 2018, at Sacramento, California.

3

4                                        _____
                                         MARY K. MCCOMB
5                                        STATE PUBLIC DEFENDER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO VACATE ORDER APPOINTING COUNSEL ON DIRECT APPEAL / PROPOSED ORDER

# APPENDIX A

Exhibit (D)

Cite as: 574 U. S. ____ (2014)          1

Statement of SOTOMAYOR, J.

# SUPREME COURT OF THE UNITED STATES

## STEPHEN MORELAND REDD v.
## KEVIN CHAPPELL, WARDEN

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 14–6264.   Decided December 1, 2014

The petition for a writ of certiorari is denied.

Statement of JUSTICE SOTOMAYOR, with whom JUSTICE BREYER joins, respecting the denial of certiorari.

Seventeen years after petitioner was first sentenced to death, and more than four years after his conviction and sentence were affirmed on direct appeal, petitioner has not received counsel to represent him in his state habeas corpus proceedings—counsel to which he is entitled as a matter of state law.  See Cal. Govt. Code Ann. §68662 (West 2009).  He has suffered this delay notwithstanding the California Supreme Court's observation that "[i]deally, the appointment of habeas corpus counsel should occur shortly after an indigent defendant's judgment of death," *In re Morgan,* 50 Cal. 4th 932, 937, 237 P. 3d 993, 996 (2010), and our own general exhortation that "[f]inality is essential to both the retributive and the deterrent functions of criminal law," *Calderon* v. *Thompson,* 523 U. S. 538, 555 (1998).  At the same time, the California Supreme Court refuses to consider capital inmates' *pro se* submissions relating to matters for which they have a continuing right to representation.  See *In re Barnett,* 31 Cal. 4th 466, 476–477, 73 P. 3d 1106, 1113–1114 (2003). Petitioner therefore remains in limbo: To raise any claims challenging his conviction and sentence in state habeas proceedings, he must either waive his right to counsel or continue to wait for counsel to be finally appointed.

Although these circumstances are undoubtedly troubling, I vote to deny the petition for certiorari because it is

2                    REDD *v.* CHAPPELL

Statement of SOTOMAYOR, J.

not clear that petitioner has been denied all access to the courts. In fact, a number of alternative avenues may remain open to him. He may, for example, seek appointment of counsel for his federal habeas proceedings. See 18 U. S. C. §3599(a)(2). And he may argue that he should not be required to exhaust any claims that he might otherwise bring in state habeas proceedings, as "circumstances exist that render [the state corrective] process ineffective to protect" his rights. 28 U. S. C. §2254(b)(1)(B)(ii). Moreover, petitioner might seek to bring a 42 U. S. C. §1983 suit contending that the State's failure to provide him with the counsel to which he is entitled violates the Due Process Clause. Our denial of certiorari reflects in no way on the merits of these possible arguments. Finally, I also note that the State represents that state habeas counsel will be appointed for petitioner "[i]n due course"—by which I hope it means, *soon.* See Brief in Opposition 6.

Exh. C



**KENNETH ALVIN SOLOMON, Ph.D., P.E., Post Ph.D**
**INSTITUTE DIRECTOR AND LABORATORY CHIEF SCIENTIST**

**Institute of Risk & Safety Analyses**
**Laboratory of Risk & Safety Analyses**

5324 Canoga Avenue          Woodland Hills, CA 91364
TEL: (818) 348-1133          FAX: (818) 348-4484

kennethsolomon@mac.com          www.irsa.us



October 23, 2019

Mr. James Dawntay Eliis
BD-5448 1-D-17
San Quentin, CA 94974

Dear Mr. Ellis,

In response to your recent letter.

1) My fee is $350.00 per hour for analyses and $700.00 per hour for testimony. Based on past similar cases, I estimate a total cost of between $12,000.00 and $15,000.00 Perhaps either a Public Defender's office or Project Innocence can assist in the cost.

2) I do believe Kenneth Gay was innocent of the convicted charges. Hopefully, he got a fair resolution.

3) I am sending a CD of a television clip I did for a similar case. It is called *Solved By Scieince* and was aired on Court TV. Mr. Robert Gay (no relation to Kenneth Gay) was falsely charged with first degfree murder and was facing the death penalty. He was found not guilty of all charges based on our analyses.

4) I am attaching my CV.

5) My analyses are totally objective. If I can show via my analyses, that you are not guilty, I will do my best to help you.

Respectfully,

Kenneth Alvin Solomon

**Institute of Risk & Safety Analyses**
5324 Canoga Avenue
Woodland Hills, CA 91364
established 1974
TEL: (818) 348-1133
TEL: (800) 429-9938
FAX: (818) 348-4484



I R S A
www.irsa.us

**Laboratory of Risk & Safety Analyses**
(Address all mail to: 5324 Canoga Avenue)
5120 Canoga Avenue
Woodland Hills, CA 91364
established 1995
TEL: (818) 226-9974
FAX: (818) 226-9979



# ACADEMIC CREDENTIALS & LICENSES

| | |
|---|---|
| Post Ph.D. | Risk-Benefit Assessment, UCLA 1977 |
| P.E. | Professional Engineering License, California, 1976 |
| Ph.D. | Engineering, UCLA, 1974 |
| M.S. | Engineering, UCLA, 1971 |
| B.S. | Engineering, UCLA, 1971 |
| B.L.S | Instructor, AHA, 2005 |

## ACCIDENT RECONSTRUCTION, HUMAN FACTORS, & BIOMECHANICS

Dr. Solomon has worked in forensic science research since 1971, addressing accident reconstruction, biomechanics, and human factors, as demonstrated by his more than 200 internationally distributed publications and reports; numerous presentations; and his 15 book co-authorships. In December 1998 (after 22 years and 9 months of service), he retired as Senior Scientist with the RAND Corporation in the Department of Engineering and Applied Sciences. Additionally, he was on the faculty at the RAND Graduate School for 18 years and was on faculty as an adjunct professor at UCLA, USC, Naval Post-Graduate School, George Mason University. He also taught the Orange County Sheriff's Academy. Dr. Solomon was a PSR (Professional Services Reserve) from 2000 to 2006, and a PSCR through July 2007, with the Orange County Sheriff-Coroner Department; he further served as a Commissioner of Policing and Safety for the City of Calabasas from 2000 to 2005. He was also a court-appointed hearing officer from 1995 through 2013.

He has taught courses on risk analyses (forensic sciences), nuclear physics, applied mathematics, uncertainty analyses, and thermodynamics/heat transfer. He has served on numerous Ph.D. dissertation and master thesis committees, was both a graduate school accreditation officer and a graduate school admissions committee member at the RAND Graduate School.

Dr. Solomon has published peer-reviewed papers and books concerning transportation accidents (automotive, trucks, motorcycles, and bicycles); industrial and recreational accidents (pressure vessels, rotating machinery, forklifts and cranes, exercise and recreational equipment, swimming pools, manufacturing and punch presses); slip-or trip-and-fall accidents; and the adequacy of warning signage.

Dr. Solomon has been court-qualified as an expert witness nearly 2400 times since 1971. In addition to his litigation practice, Dr. Solomon's practice includes providing consultation to government agencies, private companies, national laboratories, participating in televised science documentaries, and publishing in his areas of expertise.

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1974 - present | Chief Forensic Scientist, Institute of Risk & Safety Analyses |
| 1995 - 2013 | Mediator, Court Appointed, Los Angeles Superior Court |
| 1/07 - 7/07 | PSCR, Orange County Sheriff-Coroner Department (Badge P-62) |
| 2000 - 2006 | PSR (Professional Services Reserve), Orange County Sheriff-Coroner Dept. |
| 2000 - 2005 | Commissioner, Police and Safety Commissioner, City of Calabasas, California |
| 1976 - 1998 | Senior Scientist, RAND Corporation, Santa Monica, CA |
| 1982 - 1995 | Faculty, Admissions & Accreditation Committees, RAND Graduate School |
| 1989 - 2000 | Technical Specialist Volunteer, Los Angeles County Sheriff, (Badge 4573) |
| 1993 - 1995 | Visiting Faculty, Mechanical, Aerospace, Nuclear Engineering Dept., UCLA |
| 1978 - 1988 | Associate Adjunct Professor/Researcher, Mechanical, Aerospace, & Nuclear Engineering Department, UCLA |
| 1986 - 1988 | Associate Adjunct Professor, Systems Management Department, USC |
| 1974 - 1976 | Staff Engineer, NUS Corporation, Sherman Oaks, CA |
| summer 1970 | Nuclear Engineer Intern, Southern California Edison |
| 1972 | Consultant JPL/Cal Tech |

## PROFESSIONAL HONORS, ORGANIZATIONS, and ACTIVITIES (Partial List)

Tau Beta Pi Honor Society (as an Undergraduate)
Magna Cum Laude, 1971 (B.S. Degree)
Departmental Scholar, 1971 (M.S. Degree)
Highest Honors, 1974 (Ph.D. Degree)
UCLA Alumni Association, 1974-present
Atomic Energy Commission Fellowship, 1971-1974
Member of American Nuclear Society, 1972-Present
American Nuclear Society Board of Directors, LA Section, 1971-1976
UCLA Speaker's Bureau, 1972-1997
Professional Nuclear Engineer (NE 1735), 1976-present
Member of System Safety Society, 1978-1980
Member of Society of Automotive Engineers, 1984-present
Who's Who in California
Who's Who in Frontier Science and Technology
Featured in *Los Angeles Magazine*, June 1981, pp. 122-126
Secretary, International Society of Risk Analysis, 1981-1983
Guest Editor, *Journal of Hazardous Materials*, 1984-1988
Guest Editor, *Journal of Occupational Accidents*,1987-1988
Contributing Editor, VDT's in the Office Environment, 1985-1986
Member, Economics Subcommittee, Technical Research Team, Air Resources Board, State of California, 1992 to 1996 (Appointed by Governor Peter Wilson)
Kehila Kedosha Janina, 1974-present
RAND Alumni Association 1998-present
ASF, 2000-present
Faculty, ABOTA Masters In-Trial Program, Santa Barbara, CA, October 2015

**Advisory Committees** (Past and Present, Partial List):

International Committee on Biological Effects of Ionizing Radiation

Executive Committee on Continuing Education in Engineering (UCLA)

Alternate Member of International Nuclear Fuel Cycle Study Group 5

The President's AAAS Five Year Outlook Review Panel

Youth Motivation Task Force, National Academy of Science's Panel of Experts on Risk Studies

IEEE Risk Acceptance Criteria Committee

The United States GAO Special Committee on Risk Legislation

Consumer Product Safety Commission (on warnings and swimming pool designs)

Co-Administrator Sephardic Project and Administrator, Romaniote Project of Ancestory.com

Advisor U.S. Department of Energy, Advanced Techologies (LARTA)


**Reviewer for** (Partial List):

- *International Journal of Risk Analysis*
- *Science*
- *Journal of Hazardous Materials*
- *Hazard Prevention*
- *Journal of Policy Management*
- *Journal of Policy Science*

## TEACHING

**UCLA**
Statistical Thermodynamics
Energy Dependent Nuclear Kinetics
Engineering Economics
Environmental Engineering
Engineering Mathematics
Risk Assessment
Nuclear Science

**RGS**
Risk and Uncertainty

**USC**
Risk Management

**UWLA, Law School**
Warnings

## DISSERTATION AND THESIS COMMITTEES

**UCLA**
School of Engineering and Applied Sciences (five)
School of Education (four)
School of Public Health (two)

**UCSD**
Engineering (one)

**George Mason University**
School of Engineering and Applied Sciences (one)

**Naval Post Graduate School**
Systems Engineering (two)

**RGS**
(eight)

## Examples of Televised Documentaries and News Conferences

Celebrity Crashes  aired in **REELS TV**, 2016-2017

Using Bio-Mechanics to Assess Injuries from Tornadoes, Tornado Alley, **Weather Channel**, 2015 series

RTTV - **Russia Today TV** – April 18, 2013, "Explosion in West, Texas"

Solved by Science: People of California vs. Robert Gay, sponsored by **Court TV**, 2006

Emergency Preparedness and Response: The Big One, **NBC News**, aired 1987

Responding to Nuclear Waste Cleanup, **Educational Cable Television**, aired 1992

Approximately 155 news appearances on television and radio from 1980 though the present
>    Primary Topics:  Large-scale accidents, Industrial accidents, Recreational accidents, Nuclear power
>    plant safety, Weapons nonproliferation, Anti-terrorism


# PUBLICATIONS

## Books and Editorships

***Defining the Criteria for Air Bag Activation in Passenger Vehicles***, published by Lambert Academic Publishing, Germany, co-authored by Kenneth A. Solomon, Wei-Kuang Chao and Jessie Kendall, 2015, Book

***Selected Topics in Biomechanical Injuries***, published by Lambert Academic Publishing, Germany co-authored by Kenneth A. Solomon and Anne J. Yatco, 2014, Book

***The Aquatic Compendium***, published by The National Swimming Pool and Spa Foundation, co-authored by Kenneth A. Solomon, 2006, Book

***Limiting the Spread of Weapon-Usable Fissile Materials***, Brian G. Chow, Kenneth A. Solomon, sponsored by The United States National Defense Research Institute, January 1993, Book

***Dealing With Uncertainty Arising Out of Probabilistic Risk Assessment***, Kenneth A. Solomon, sponsored by Oak Ridge National Laboratory, September 1983, Paperback

***Risk-Cost Assessment Methodology for Toxic Pollutants from Fossil Fuel Power Plants***, Rand Corporation, Kenneth A. Solomon, J.G. Bolten, sponsored by Electric Power Research Institute, P. F. Morrison, January 1983, Paperback

***Monitoring Technologies for Ocean Disposal of Radioactive Waste***, published by The Rand Corporation, Kenneth A. Solomon, Mark B. Triplett, January 1982, Book

***Issues and Problems in Inferring a Level of Acceptable Risk***, published by The Rand Corporation, Kenneth A. Solomon, Steven L. Salem, Michael S. Yesley, January 1980, Book

***Away-from-Reactor Storage of Spent Nuclear Fuel: Factors Affecting Demand***, sponsored by The U.S. Department of Energy, Kenneth A. Solomon, Patricia M. Dinneen, Mark B. Triplett, January 1980, Book

***The Index of Harm: A Measure for Comparing Occupational Risk across Industries***, sponsored by The Electric Power Research Institute, Kenneth A. Solomon, Stanley Charles Abraham, January 1979, Book

***International Arrangements for Uranium Enrichment***, Marvin Miller, Kenneth A. Solomon, Michael Mihalka, sponsored by The U.S. Department of Energy, January 1979, Book

*Nuclear Reactor Spent Fuel Valuation: Procedure, Applications, and Analysis*, Kenneth A. Solomon, sponsored by The U.S. Department of Energy, January 1978, Book

"A Comparison of Risks in and around Swimming Pools," in *Aquatic Safety Compendium*, Jan. 2005, sponsored by the National Swimming Pool Foundation

"The Mechanics of Diving," in *Aquatic Safety Compendium*, Jan. 2005, sponsored by the National Swimming Pool Foundation, DVD Format

"A Value Impact Method for Improving Automotive Safety," in *Automotive Safety and Litigation*, Vol. I, Garland Press, New York, December 1983

"Improving Automotive Safety: The Role of Industry, Government, and Driver" in *Risk Assessment & Management*, Vol. 5, Plenum Press, New York, 1987

"A Value Impact Approach for Regulatory Decision Making" in *Risk Assessment & Management*, Vol. 5, Plenum Press, New York, 1987

Guest Editor *Journal of Hazardous Materials*, Special Issue on Risk Assessment & Management, Vol. 10, 1985

Guest Editor *Journal of Hazardous Materials*,  Special Issue on Risk Regulation, May 1987

Guest Editor *Journal of Hazardous Materials*, Special Issue on Legislative Issues, June 1988


## Published Articles

"Air Bag Deployment Criteria," *The Journal of The Forensic Examiner*, August 2014, http://www.theforensicexaminer.com

"Shoulder Injury Mechanisms and Integrative Medicine Therapies," *Journal of the American Association of Integrated Medicine*, August 2014, link: http://www.aaimedicine.com/blog/2014/08/shoulder-injury-mechanisms-and-integrative-medicine-therapies

"Ankle Injury Mechanisms and Integrative Medicine Therapies," *Annals of the American Psychotherapy Association*, Winter 2012  Spring 2013, pages 54 to 61

"Effective Examination of the Expert," CLE Authority (MCLE), Pasadena CA.  Video Instruction, 2007

"Types of Knee Injuries & How They Occur," *Journal of Forensics*, Spring 2005

"How Much Plutonium Do We Need: A Case Study - Japan," *International Journal of Hazardous Material*, 44 (November 1995) pp1-23

"Risks to Workers on the Ground from Aircraft Crashes," *Journal of Occupational Accidents*; 1989

"A Comparison of Occupational Risks Among Industries," *Journal of Occupational Accidents*; Vol. 11, pp 19-35, 1989

"Radiation in the Ocean Environment," *Special Issue on Risk Management of the Journal of Hazardous Materials*, June 1988

"Estimating the Population Exclusion Zone Around a Nuclear Reactor," *Special Issue on Risk Management of the Journal of Hazardous Materials*, 1988

"Alternative Risk Management Practices at the Local, State, and Federal Level of Government," *Special Issue on Risk Management of the Journal of Hazardous Materials*, Vol. 15- No.1, May 1987

"Guest Editorial and Introductory Paper on Risk Regulation and Legislation," *Special Issue on Risk Management of the Journal of Hazardous Materials*, March 1987

"On the Use of Confidence Intervals in Risk Management," *Journal of Hazardous Materials*, (10) 1985

"A Survey of Monitoring Requirements for Sub-Seabed Disposal of Radioactive Waste," *Journal of Hazardous Materials,* (10) 1985, pp. 205-226

"An Evaluation of Alternative Safety Criteria for Nuclear Power Plants," *Journal of Risk Analysis*, Vol. 5, No. 3, 1985

"An Examination of Risk Management at the Local Level of Government," invited paper to *Journal of Hazards Prevention*, July/August 1985, pp. 12-15

"Dealing With Reliability and Risk Analysis at the Local Level," *Journal of Policy Science*, Vol. 16, 1984, pp. 245-265

"De Facto Liability Limits: Another Look," invited paper, *Journal of Hazard Prevention,* September 1984

"Risk Management in Local Communities," *Journal of Hazard Prevention*, July/August 1984

"How Unique Are the Price Anderson Limitations on Nuclear Accident Liability?" *Journal of Risk Analysis*, Vol. 3, No. 1, December 1983

"Quantitative Safety Goals Through More Adequate Risk Management and Risk Assessment," *Journal of Reliability Engineering,* Vol. 4, No. 2, February 1983, pp. 65-84

"The Index of Harm:  A Useful Measure for Comparing Occupational Risks Across Industries," Journal of Health Physics, Vol. 38, March 1980, 375-381

"Liability Limits and Insurance," *Hazard Prevention*, Vol. 14, No. 5, May/June 1978

"Analysis of Ground Hazards Due to Aircraft and Missiles," *Hazard Prevention*, Vol. 12, No. 4, March/April 1976

"Pressure Vessel Weld Integrity," *Nuclear Engineering and Design*, Vol. 25, December 1975

"Reliability of the Core Auxiliary Cooling System," *Nuclear,* Vol. 34, No. 3, November 1975

"Additional Comments on Estimate of Hazards to a Nuclear Reactor from the Random Impact of Meteorites," *Nuclear Technology*, Vol. 27, No. 2, November 1975

"Risk of the Chemical Industry," *Hazard Prevention*, Vol. 11, No. 5, May/June 1975

"Airplane Crash Model," *Hazard Prevention*, Vol. 11, No. 3, January/February 1975

"Estimates of Hazards to Nuclear Reactors from Random Impact of Meteorites," *Nuclear Technology*, January 1975

"Linear Stability of Fast and Thermal Reactors," *Nuclear Science and Engineering*, Vol. 49, pp. 99-107, 1972

## Presentations and Transactions

"The Threat of Global Nuclear Terrorism," Presented at the International Society of Probabilistic Risk Analysis, at UCLA in May 2001

"Comparing Alternative Strategies for Improving Automotive Safety," Proceedings of the International Society of Risk Analysis meeting, held in Washington, D.C., September 1986

"Value Impact Assessment for Regulatory Decision Making," Proceedings of the International Society of Risk Analysis meeting, held in Washington, D.C., September 1986

"Making Decisions Under Uncertainty," paper presented at American Nuclear Society, Detroit, MI, June 1983

"Selecting An Optimal Strategy for a Safer Automobile," invited paper presented to the Society for Risk Analysis, Annual Meeting, Washington, D.C., October 1985, and printed in the meeting proceedings

"Cost of Closing Nuclear Plants: Involuntary vs. Voluntary Closure," invited paper at American Physics Society, Los Angeles, CA, March 1983

"Procedure for Calculating the Value of Spent Fuel," joint meeting of the European Nuclear Society and the American Nuclear Society, Hamburg, West Germany, May 1979

"Spent Reactor Fuel: Policy Implications," 1978 winter meeting of the American Nuclear Society, Washington, D.C., November 1978

"CACS Reliability in the HTGR," ANS Conference, New Orleans, Louisiana, June 1975

"Power Plant Siting and Aircraft Hazards," ANS/CNS meeting, Toronto, Canada, June 1976

*Optimal Inspection of Pressure Vessel Welds*, ANS/CNS meeting, Toronto, Canada, June 1976

"Fault Tree Analysis of Reactor Systems with Application to the Residual Heat Removal System of a BWR," ANS Calculational Physics Topical Meeting, University of Michigan, Ann Arbor, Michigan, April 1973

"Nuclear Reactor Stability," Western-Midwestern Meeting of the Student Branches of the ANS, Pocatello, Idaho, April 1972

"Contingency System Optimization for Nuclear Power Plants," 1975 Annual Reliability and Maintainability Symposium (RAMS), Washington, D.C., January 1975

"Weld Inspection Procedures," Third International Conference on Structural Mechanics in Reactor Technology (SMIRT), London Imperial College, September 1975

"Energy for the Future: Facing Radiation Protection Issues," invited paper at WATTec National Energy Conference, Knoxville, TN, February 1983

"Issues in Perceiving Risk," an invited paper at the Health Physics Society, Annual Meeting, Knoxville, TN, February, 1983

"Courses Offered in Risk Analysis," invited paper presented at the International Society of Risk Analysis, June 1982 meeting in Crystal City, VA

"Assessing the Cost of Closing Down a Nuclear Power Plant: Method and Application," presented at the November 1982 meeting of the American Nuclear Society, Washington, D.C.

"Issues In Risk Acceptance," presented at Reliability 1981 Conference, England, May 1, 1981

## Peer reviewed articles and rep: RAND

*Warnings: When do they help; When do they harm?* RAND P-7892, Feb., 1995

*Limiting the Spread of Weapons-Usable Fissile Materials*, RAND-346-UDDP, 1994

*An Assessment of The Defense Nuclear Agency Functions*, RAND, 1995

*Plutonium for Japan's Nuclear Reactor's: Paying Both the Proliferation and Dollar Price to Assure Long-Term Fuel Supply*, RAND MR-186-CC, March 1993.

*Limiting The Spread of Weapon-Usable Fissile Materials*, RAND, MR-346-USDP, November 1993

*Airport Growth and Safety: A Study of the External Risks of Schiphol Airport and Possible Safety-Enhancement Measures*, RAND, MR-288-EAC/VW, 1993.

*Airport Growth and Safety: Executive Summary of the Schiphol Project*, RAND, MR-297-EAC/VW, 1993

*Swimming Pool Risks: How Do They Compare to Other Accidental Risks?* RAND P-7841, November 1993

*Alternative Sources of Tritium*, RAND, MR-205-ACQ, April 1993

*DoD Spectrum Management Program*, DRR-602-C3I

*Power Options for Space Exploration*, a talk presented to the American Nuclear Society, Los Angeles, Sept 1992

*An Assessment of Deep Fires Alternatives in Third World Countries*, RAND Report, 1992

*Preliminary Thoughts Concerning Potential U.S. Army Threats/Roles*, P-7697-A, June 1991

*Comprehensive Self-Study Report submitted to the Western Association of Schools and Colleges in Support of an Application for Reaffirmation of Accreditation*, co-authored by a nine person Steering Committee of RGS Faculty and RAND Management, January 1990

*SEI Project Outreach Evaluations: Space and Surface Power*, N-3280-AF/NASA, June 1991

*An "Adequate Insurance" Appraisal to Critical Dependencies of the Department of Defense*, R-3880-USDP, July 1991

*Generating Tritium in Civilian Nuclear Reactors*, The RAND Corporation, N-3203-ACQ, December 1990

*A Primer on the Production and Use of Tritium*, The RAND Corporation, N-3201-ACQ, November 1990

*Risks to the Civilian Population from the Use of Biological Weapons by Terrorists Groups*, N-2776-AFMIC, June 1989

*Risks to Air Force Bases from the Use of Biological Weapons by Terrorists Groups*, N-2777-AF, June 1989

*Measuring Safety Across Industries* , The RAND Corporation, P-7405, Nov 1988

*Ground Risk Associated With Aircraft Crashes*, The RAND Corporation, P-7459, Nov 1987

*Issues in Swimming Pool Design and Diving Safety*, The RAND Corporation, P-7370, Nov 1987

*Risk Management Practices at the Local, State, and Federal Level*, The RAND Corporation, P-7263, Nov 1986

*Sources of Radioactivity in the Ocean Environment*, The RAND Corporation, P-7273, October 1986

*Alternative Models for Risk Assessment of Toxic Emissions*, The RAND Corporation, N-2261-EPRI, April 1985

*Improving Automotive Safety: The Role of the Industry, the Government, and the Driver*, The RAND Corp., P-7069, July 1985

*Review of Four Analyses Estimating the Emergency Planning Zones (EPZs) for the Shoreham Nuclear Reactor*, The RAND Corporation, N-2353-DOE, August 1985

*Dealing With Uncertainty Arising out of Probabilistic Risk Assessment*, The RAND Corporation, R-3045-ORNL, Sept 1983

*Risk-Cost Assessment Methodology for Toxic Pollutants from Coal-Fired Plants*, The RAND Corporation, R-2993-EPRI, June 1983

*Risk-Management Practices in Local Communities*, The RAND Corporation, P-6821, October 1982

*Total Cost Estimates for Closing Indian Point*, The RAND Corporation, P-6822, September 1982

*An Evaluation of Alternative Safety Criteria*, The RAND Corporation, N-1806-ORNL, June 1982

*Preliminary Survey Of Risk and Safety Offerings at Selected Universities*, The RAND Corporation, P-6762, June 1982

*Estimating The Cost of Closing Down a Nuclear Reactor*, The RAND Corporation, R-2857-NYO, Dec 1981

*Monitoring Technologies For Ocean Disposal of Radioactive Waste*, The RAND Corporation, R-2773-NOAA, December 1981

*Scenarios for Evolution of Air Traffic Control*, The RAND Corporation, R-2698-FAA, November 1981

*The High Temperature Gas Cooled Reactor: An Overview of Safety Issues*, The RAND Corporation, N-1589-GCRA, December 1980

*Away from Reactor Storage and Disposal of Spent Nuclear Fuel: Factors Affecting Demand*, The RAND Corporation, R-2558-DOE, August 1980

*Summary of Issues and Problems in Inferring a Level of Acceptable Risk*, The RAND Corporation, P-6519, July 1980

*Issues and Problems in Inferring a Level of Acceptable Risk*, The RAND Corporation, R-2561-DOE, July 1980

*Some Implications of the Three Mile Island Accident on LMFBR Safety and Licensing: The Design Basis Issue*, The RAND Corporation, N-1559-DOE, July 1980

*The Index of Harm: A Measure for Comparing Occupational Risk Across Industries*, The RAND Corporation, R-2409-RC, June 1979

*Anticipated Transients Without SCRAM for Light Water Reactors: Implications For Liquid Metal Fast Breeder Reactors*, The RAND Corporation, N-1188-DOE, June 1979

*International Arrangements for Uranium Enrichment*, The RAND Corporation, R-2427-DOE, May 1979

*Valuation of Nuclear Reactor Spent Fuel Using the HP 67/97 Programmable Calculator*, The RAND Corporation, N-1176-DOE, April 1979

*Procedure for Nuclear Reactor Spent Fuel Valuation*, The RAND Corporation, P-6240, November 1978

*More on Insurance and Catastrophic Events: Can We Expect De Facto Limits on Liability Recoveries?* The RAND Corporation, P-5940, March 1978

*Nuclear Reactor Spent Fuel Valuation: Procedure, Application and Analysis*, The RAND Corporation, R-2239-DOE, February 1978

*Seismic Building Codes for the City of Los Angeles: A Brief Case Study*, The RAND Corporation, P-6018, November 1977

*Some Comments on De Facto Limits of Liability*, P-5885 The RAND Corporation, June 1977

The Light Water Reactor:  Development and Commercialization, The RAND Corporation, R-2180-NSF, May 1977

## **Other Reports**

*Dealing With Uncertainty*, Oak Ridge National Laboratory, Report No. ORNL/RM-9076, March 1984

*Final Report: Alternative Risk Management Policies for State and Local Governments*, University of California, Los Angeles, UCLA-ENG-8240, May 1982

*Executive Summary: Alternative Risk Management Policies for State and Local Governments*, University of California, Los Angeles, UCLA-ENG-8241, May 1982

*Risk Management Practices in Local Communities: Five Alternatives*,  University of California, Los Angeles, UCLA-ENG-8242, May 1982

*Management of Risks Associated With Drinking Water*, University of California, Los Angeles, UCLA-ENG-8243, May 1982

*Classification of Risk: A Taxonomy*,  University of California, Los Angeles, UCLA-ENG-8245, May 1982

*Earthquake Ordinances for the City of Los Angeles, California: A Brief Case Study*, University of California, Los Angeles,  UCLA-ENG-7765, October 1977

*De Facto Liability Limits*, University of California, Los Angeles, UCLA-ENG-7732, May 1977

*State by State Chemical Risk Assessment Survey*, University of California, Los Angeles, UCLA-ENG-76125, December 1976

*A Methodology for Assessing Aircraft Crash Probabilities*, Centre de Development Technolugque, Atomic Energy Control Board of Canada, Report IGN-126, September 1976

*An Assessment of the Risk Due to a Hypothetical Nuclear Accident*, NUS Report No.1538, November 1975

*Risk Associated With Nuclear, Coal, and Oil Fuel Cycles,* NUS Report No. 1537, November 1975

*Summary of Comments to WASH-1400 (DRAFT)*, NUS Corporation, NUS Report No. 1502, Sept. 1975

*Siting of Nuclear Power Plants with Respect to Potential Hazards from Aircraft Impacts*, NUS Report No. 1416, May 1975

*Development of Flaws in Nuclear Reactor Pressure Vessel Welds*, University of California, Los Angeles, UCLA-ENG-7496, February 1975

*Prediction of Core Auxiliary Cooling System Availability and Reliability*, University of California, Los Angeles, UCLA-ENG-7495, February 1975

*Nuclear Power Plant Reliability*, Ph.D. Dissertation, UCLA School of Engineering and Applied Science, December 1974

Contributed to *AEC Study WASH-1400, Reactor Safety Study*, June 1974

*Potential Hazards to a Nuclear Reactor from the Random Impact of Meteorites,* University of California, Los Angeles, UCLA-ENG-7426, March 1974

*The Risk of Catastrophic Spills of Toxic Chemicals,* University of California, Los Angeles, UCLA-ENG-7425, March 1974, edited by K.A. Solomon

*Airplane Crash Risk to Ground Population,* University of California, Los Angeles, UCLA-ENG-7424, March 1974

MHD Topping Cycles, Jet Propulsion Laboratory, JPL-1200-59, May 1973

*Methods of Determining Oscillations and Linear Stability of a Nuclear Reactor Using Space Dependent Kinetics*, M. S. Thesis, UCLA School of Engineering and Applied Science, September 1971

<u>CERTIFICATE OF SERVICE</u>

I, <u>James Dawntay Ellis</u> do hereby declare that I am over the age of eighteen and I currently am housed in San Quentin State Prison, in San Rafael, CA 94974.

Further, I declare that I placed a true and correct copy of the enclosed Petition for Writ of habeas Corpus into postage pre-paid envelope addressed to the following agencies and/or individuals:

1.  United States District Court
    Central District of California
    Edward R. Roybal Federal Building
    255 E. Temple St.
    Los Angeles, CA 90012-3300

2.  California State Attorney General
    Attn: Exavier Becerra
    1300 I Street
    P.O. Box 944255
    Sacramento, CA 94244-2550

3.  San Bernandino Superior Court
    Attn: Judge, Eric M. Nakata
    Victorville District/Criminal & Traffic Div.
    114455 Civic Drive Suite 200
    Victorville, CA 92392-2397

4.  California Supreme Court
    Attn: Capital Appeals Unit
    Earl Warren Building
    350 McAllister Street
    San Francisco, CA 94102-4797

I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge.

Date: 12-26-0-19

JAMES DAWNTAY ELLIS



MR. JAMES D. ELLIS
BD-5448 1-D-17
SAN QUENTIN, CA 94974

U.S. DISTRICT COURT
CENTRAL District of CALIF.
EDWARD R. ROYBAL FEDERAL BLVD.
255 E. Temple St.
LOS ANGELES, CA 90012-3300

